Case No. 15-1593

---

*UNITED STATES COURT OF APPEALS*
*FOR THE FEDERAL CIRCUIT*

---

**DRÄGER MEDICAL GMBH, a German Corporation;**
**DRAEGER MEDICAL SYSTEMS, INC.; and**
**DRAEGER MEDICAL, INC., a Delaware Corporation,**

*Plaintiffs-Appellants,*

**v.**

**ALLIED HEALTHCARE PRODUCTS INC., a**
**Delaware Corporation,**

*Defendant-Appellee.*

---

Appeal from the United States District Court
for the District of Delaware
In Case No. 13-CV-01656, Judge Sue L. Robinson.

---

**CORRECTED OPENING BRIEF FOR APPELLANTS**
**DRÄGER MEDICAL GMBH ET AL.**
**[NONCONFIDENTIAL VERSION]**

---

Cyrus A. Morton
Angela M. Muñoz-Kaphing
Li Zhu
Brenda L. Joly
ROBINS KAPLAN LLP
800 LaSalle Avenue, Suite 2800
Minneapolis, MN 55402-2015
Tel.: (612) 349-8500

June 29, 2015
[Corrected July 15, 2015]

*Attorneys for Plaintiffs-Appellants*
*Dräger Medical GmbH et al.*

# CERTIFICATE OF INTEREST

Counsel for the appellants, Dräger Medical GmbH, Draeger Medical Systems, Inc., and Draeger Medical Inc., certifies the following:

1.      The full name of every party or amicus represented by me is:

Dräger Medical GmbH, Draeger Medical Systems, Inc., and Draeger Medical Inc.

2.      The name of the real party in interest represented by me is:

The parties named in the caption are the real parties in interest.

3.      All parent corporations and any publicly held companies that own 10 percent or more of the stock of the party or amicus curiae represented by me are:

Dräger Medical GmbH is a German corporation and is wholly owned by its parent corporation Drägerwerk AG & Co. KGaA, which owns 100% of its stock. Draeger Medical Systems, Inc. is a Delaware corporation and is wholly owned by Dräger Medical International GmbH, which owns 100% of its stock. Dräger Medical International GmbH is a German corporation and is wholly owned by Dräger Medical GmbH, which owns 100% of its stock. Draeger Medical Inc. is a Delaware corporation and is wholly owned by Draeger Medical Systems, Inc, which owns 100% of its stock.

4.      The names of the law firms and the partners or associates that appeared for the party or amicus now represented by me in the trial court or agency or are expected to appear in this court are:

Robins Kaplan LLP (Cyrus R. Morton, Angela M. Muñoz-Kaphing, Li Zhu, Brenda L. Joly, Julia Dayton Klein (former)); DLA Piper LLP (Denise S. Kraft, Brian A. Biggs); and Young, Conaway, Stargatt Taylor LLP (Anne S. Gaza, Robert M. Vrana).

Dated: June 29, 2015          By: _/s/ *Cyrus A. Morton*_____
                                    Cyrus A. Morton

# TABLE OF CONTENTS

**Page**

STATEMENT OF RELATED CASES ................................................................1

JURISDICTIONAL STATEMENT ..............................................................2

STATEMENT OF THE ISSUES ..............................................................3

STATEMENT OF THE CASE..............................................................4

    A.   Preliminary Statement ................................................................4

    B.   The Infringement Suit................................................................6

    C.   The Invention ................................................................7

    D.   Draeger Medical's Patented CLIC Products ...........................16

    E.   Allied's Copied Products and Marketing Efforts...................18

    F.   The District Court's Denial of Draeger Medical's
         Preliminary Injunction................................................................20

    G.   The District Court's Grant of Allied's Summary
         Judgment Motion ................................................................21

SUMMARY OF ARGUMENT................................................................24

STANDARD OF REVIEW ................................................................27

ARGUMENT................................................................28

I.   DRAEGER MEDICAL'S PATENT RIGHTS ARE NOT
     EXHAUSTED BY SALES OF ITS CLIC ADAPTERS, OR
     CANISTERS, INDEPENDENTLY, AS THESE SALES ARE
     NOT "COMBINATION SALES."................................................................28

    A.   Neither Component Alone "Substantially Embodies"
         the Patented Technology as Required by *Quanta* for
         Patent Exhaustion by Component Sales. ...............................29

B.    Component Sales Do Not Compensate Draeger Medical for Its Invention and Do Not Exhaust Infringement Claims...........................................................................................34

II.    THE DISTRICT COURT ERRED BY ASSUMING THAT THE SINGLE SALE OF A PATENTED COMBINATION EXHAUSTS PATENT RIGHTS AS TO ALL INSTANCES OF INFRINGEMENT. ..............................................................41

III.   THE DISTRICT COURT ERRED TO THE EXTENT IT HELD THE DOCTRINE OF PERMISSIBLE REPAIR SUPPORTED ITS DECISION IN THE ABSENCE OF AN EXHAUSTING FIRST SALE. ........................................................................44

IV.    THIS CASE CONSTITUTES IMPERMISSIBLE RECONSTRUCTION AND NOT PERMISSIBLE REPAIR. ...........47

CONCLUSION ....................................................................................57

## OMITTED MATERIALS

The materials omitted on page 17 indicate the length of time in years that Draeger Medical's inventory agreements with customers typically last and the dollar amount of Draeger Medical's pricing to customers for CLIC adapters.

The materials omitted on page 18 indicate the dollar amount of Draeger Medical's pricing to customers for CLIC canisters and information regarding amounts of Draeger Medical's CLIC canister sales between 2010 and 2012.

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Aro Mfg. Co. v. Convertible Top Replacement Co.,*
   365 U.S. 336 (1961) ........................................................ 38, 46, 47, 51, 55, 56

*Aro Mfg. Co. v. Convertible Top Replacement Co.,*
   377 U.S. 476 (1964) .............................................................. 37, 41, 42, 43, 56

*Bowman v. Monsanto,*
   133 S. Ct. 1761 (2013) ............................................................................ 41, 48

*Canon, Inc. v. GCC Int'l, Ltd.,*
   263 Fed. Appx. 57 (Fed. Cir. 2008) .............................. 47, 50, 51, 52, 53, 54

*Cotton-Tie Co. v. Simmons,*
   106 U.S. 89 (1882) .................................................................................. 47, 49

*Crown Operations Int'l v. Solutia Inc.,*
   289 F.3d 1367 (Fed. Cir. 2002) ...................................................................27

*E. Bement & Sons v. National Harrow Co.,*
   186 U.S. 70 (1902) .........................................................................................40

*Fuji Photo Film Co. v. ITC,*
   474 F.3d 1271 (Fed. Cir. 2007) ........................................................ 35, 44, 45

*Helferich Patent Licensing, LLC v. New York Times Co.,*
   778 F.3d 1293 (Fed. Cir. 2015) ...................................................... 27, 30, 41, 43

*Husky Injection Molding Sys. v. R&D Tool & Eng'g Co.,*
   291 F.3d 780 (Fed. Cir. 2002) .....................................................................51

*Jazz Photo Corp. v. ITC,*
   264 F.3d 1094 (Fed. Cir. 2001) ........................................................ 44, 46, 48

*Keurig, Inc. v. Sturm Foods, Inc.*,
    732 F.3d 1370 (Fed. Cir. 2013) ....................................................37

*LifeScan Scotland, Ltd. v. Shasta Technologies, LLC*,
    734 F.3d 1361 (Fed. Cir. 2013) ...................................... 35, 36, 37

*Mallinckrodt, Inc. v. Medipart, Inc.*,
    976 F.2d 700 (Fed. Cir. 1992) ....................................................40

*Poller v. Columbia Broad. Sys., Inc.*,
    368 U.S. 464 (1962) ...................................................................27

*Quanta Computer, Inc. v. LG Electronics, Inc.*,
    553 U.S. 617 (2008) ....................... 24, 28, 29, 31, 33, 34

*Sage Products, Inc. v. Devon Industries, Inc.*,
    45 F.3d 1575 (Fed. Cir. 1995) ............................ 21, 27, 53, 54, 55

*Surfco Hawaii v. Fin Control Systems Pty. Ltd.*,
    264 F.3d 1062 (Fed. Cir. 2001) ........................................... 46, 47

*United States v. Aluminum Co. of Am.*,
    148 F.2d 416 (2d Cir. 1945) .......................................................46

*United States v. Masonite Corp.*,
    316 U.S. 265 (1942) ...................................................................38

*United States v. Univis Lens Co.*,
    316 U.S. 241 (1942) ...................................................................38

## Statutes

28 U.S.C. § 1295(a)(1) ............................................................2

28 U.S.C. § 1331.....................................................................2

28 U.S.C. § 1338(a) ................................................................2

35 U.S.C. § 271(c) ................................................................42

# STATEMENT OF RELATED CASES

Pursuant to Federal Circuit Rule 47.5, appellants provide as follows:

(a)      There have been no previous appeals in this case.

(b)      They are aware of no other case that will directly affect or be

directly affected by the Court's decision in this case.

# JURISDICTIONAL STATEMENT

The district court had jurisdiction over the patent infringement action underlying this appeal pursuant to 28 U.S.C. §§ 1331 and 1338(a). The district court entered summary judgment of non-infringement and final judgment in favor of Allied Healthcare Products, Inc. ("Allied") on March 27, 2015. Dräger Medical GmbH, Draeger Medical Systems, Inc. and Draeger Medical Inc. (collectively "Draeger Medical") timely filed an appeal to the Federal Circuit on April 21, 2015. This Court has jurisdiction over the appeal pursuant to 28 U.S.C. § 1295(a)(1).

# STATEMENT OF THE ISSUES

1.      Whether the district court erred by finding that Draeger Medical's provision of Dräger CLIC adapters to customers was "in reality for the patented combination" and that such provision exhausted Draeger Medical's patent rights?

2.      Whether the district court erred as a matter of law in concluding that any sales of the Dräger CLIC adapters and/or Drägersorb® CLIC canisters, even independent sales of one of these products, exhausted Draeger Medical's rights to prohibit or be compensated for all acts of infringement of its patents related to the combination of a CLIC-style adapter and canister?

3.      Whether the district court erred by conducting its factual analysis "with reference to the doctrine of permissible repair" rather than determining first whether Draeger Medical's patents were exhausted as a prerequisite to finding permissible repair?

4.      Whether the district court erred by finding that replacing Draeger Medical's Drägersorb® CLIC canisters with Allied's "Dräger Style" canisters constituted permissible repair rather than impermissible reconstruction of the patented combination?

3

# STATEMENT OF THE CASE

### A.    Preliminary Statement

This patent infringement case relates to carbon dioxide ($CO_2$) absorbers for rebreathing systems such as anesthesia machines. The patent claims at issue are directed to a $CO_2$ absorber system comprising two different components: (1) a canister filled with a mixture of chemicals called "soda lime" for filtering out $CO_2$ and (2) an adapter for connecting the canister to the anesthesia machine. A19-20, A34-35. These claims are embodied in Draeger Medical's "Drägersorb® CLIC" disposable canister together with the Dräger CLIC adapter. Draeger Medical brought this patent infringement action against Defendant Allied, alleging that Allied's actions, including its manufacture and sale of "Dräger Style" Litholyme and Carbolime soda lime canisters, directly infringe, contributorily infringe, and/or induce infringement of the two Draeger Medical patents-in-suit. A53-61.

On March 27, 2015, the district court granted Allied's summary judgment motion for non-infringement based on the doctrines of patent exhaustion and permissible repair. A2. The court's ruling is reversible error.

The district court's conclusion that the sale of Draeger Medical's products exhausted all Draeger Medical's patent rights contradicts existing Supreme Court and Federal Circuit precedent. The court's ruling tramples on patentees' rights by allowing anyone to "copy," without liability, any inventive portion of a patented combination less than the whole. Draeger Medical's independent sales of products embodying only portions of the patented combination did not exhaust all its infringement claims regarding the patented combination.

The court's determination that non-infringement could be found under the doctrines of permissible repair and/or patent exhaustion is also erroneous. This framework runs counter to the law of this Court requiring an exhausting first sale *before* reaching a repair vs. reconstruction analysis relevant to the doctrine of permissible repair. This incorrect approach ultimately caused the district court to misapply the law to the facts and conclude that "the facts of the record are more appropriately analyzed with reference to the doctrine of permissible repair" rather than exhaustion.

Finally, even assuming there is exhaustion, the district court still erroneously determined that replacing Draeger Medical's canister with

5

Allied's own canisters was permissible repair rather than impermissible reconstruction.

## B.    The Infringement Suit

Draeger Medical filed a complaint against Allied on October 4, 2013, alleging infringement of U.S. Patent Nos. 7,487,776 ("the '776 Patent) and 8,286,633 ("the '633 Patent") (collectively "the Asserted Patents"). A11-35. Draeger Medical subsequently filed a motion for preliminary injunction seeking to prohibit Allied from selling its "Dräger Style" Litholyme and Carbolime $CO_2$ canisters. A91-95. Draeger Medical's motion was denied on March 24, 2014. A1144-51.

On June 20, 2014, Allied filed a motion for summary judgment of non-infringement based on the doctrines of permissible repair and patent exhaustion. A1152-54. The district court granted Allied's summary judgment motion, and entered final judgment, on March 27, 2015. A1, A2. The court's ruling referred back, in part, to its initial denial of Draeger Medical's motion for preliminary injunction. A9. Draeger Medical timely appealed. A52.

## C.   The Invention[1]

The removal of $CO_2$ is a critical part of keeping an anesthetized patient oxygenated. A206. Failure to do so could create "dire consequences" for patients, including death. A588, A1100. Two common types of $CO_2$ absorbers are "loose fill" canisters and "disposable" canisters, both of which use soda lime to filter out harmful gases such as $CO_2$. A205. In an anesthesia machine that uses a loose fill canister, the canister is opened and refilled with soda lime on a recurring basis when necessary. A205. Disposable absorbers, on the other hand, do not require manual refilling of the soda lime canister. *Id.* Instead, the pre-filled soda lime canister is attached to the anesthesia machine using an adapter. *Id.* When the canister is used up, it is simply removed from the adapter, and a new pre-filled canister is installed in its place. *Id.* It is important for the adapter to fit tightly around the canister, such that no "leaks" are present in the connection to the anesthesia machine. A206.

Draeger Medical developed its patented $CO_2$ absorber system, which it refers to as a "CLIC system," to provide several benefits to clinicians over

---

[1] In view of the summary-judgment posture of the case, the facts set forth here are either undisputed or taken in the light most favorable to Draeger Medical.

the pre-existing "loose fill" and disposable soda lime options. First, it is cleaner and more convenient to remove and replace a CLIC canister than it is to replace loose fill soda lime. A205-06. Second, the CLIC system allows clinicians to avoid contact with soda lime and soda lime dust. *Id.* Third, the CLIC system allows more complete utilization of soda lime, reducing costs. *Id.* Finally, the CLIC system allows clinicians to change the canister at any time, even during surgery, thanks to the non-return valve. *Id.*

For its invention, Draeger Medical was awarded the '776 Patent on February 10, 2009. A11-20. By way of example, claim 1 of the '776 Patent reads:

> 1.    An anesthesia respiration system to absorber connection device, comprising:
>
>     an absorber for connecting with the anesthesia respiration system, the absorber having an absorber housing, with a gas inlet opening concentrically arranged relative to a gas outlet opening on a front side of said absorber housing, as well as a guide plate;
>
>     an anesthesia respiration system absorber mount, said guide plate being adapted to be pushed into said absorber mount;
>
>     a centering notch provided on a front side of said guide plate in a direction of pushing in; and

> a centering pin, which engages the centering notch
> and fixes the guide plate in an end position, said
> centering pin being fastened to said absorber
> mount.

A19. The '776 Patent claims a number of novel features directed to the interface between the CLIC adapter and the CLIC canister. These include a "guide plate" with a "centering notch" on the CLIC canister "adapted to be pushed into" the CLIC adapter, described as an "absorber mount," with "a centering pin" that "engages" the centering notch on the CLIC canister. *Id.*

Draeger Medical later improved upon the interface between the CLIC adapter and the CLIC canister, and was awarded the '633 Patent on October 16, 2012. A21-35. The '633 Patent was an improvement on the connection itself. By way of example, claim 1 of the '633 Patent reads:

> 1.   A carbon dioxide absorber for a rebreathing system,
> the carbon dioxide absorber comprising:
>
> a connection head at the rebreathing system, said
> connection head including a pivotable mount;
> an absorber housing;
>
> a guide plate on a front side of said absorber
> housing, said guide plate being pushed into said
> pivotable mount of said connection head;
>
> guide plate gas ducts arranged concentrically at
> said guide plate;

connection head gas ducts provided in said connection head and with a design corresponding to said guide plate gas ducts, said guide plate gas ducts for connection to said connection head gas ducts;

guide grooves between said guide plate and said absorber housing for connecting said guide plate to said mount;

**centering pins** pointing in a direction of said absorber housing from said connection head; and

centering means in one or more of said guide plate and said absorber housing, said **centering means for meshing with said centering pins from said connection head**;

said pivotable mount being pivotable between a first position and a second position, said first position arranging said pivotable mount adjacent said connection head, said second position arranging said pivotable mount spaced from said connection head and said centering pins.

A34 (emphasis added). The '633 Patent claimed a number of improvements to the '776 Patent, including, for example, multiple "centering pins" on the CLIC adapter and "centering means for meshing with said centering pins" that form a better connection between the CLIC adapter and CLIC canister. *Id.* In addition, the '633 Patent claimed "upper positioning grooves arranged opposite each other" and "lower positioning grooves extending

10

flush with said upper positioning grooves" that mesh with the centering

pins on the CLIC adapter. *Id.* at dependent claims 2 and 3.

A diagram of the CLIC canister is shown below:



A28. The centering pins on the CLIC adapter fit tightly into the upper and

lower positioning grooves on the CLIC canister to better center the entire

configuration:



A31; *see also* A32 at col.2 ll.17-24, 46-51. The '633 Patent also claimed the improvement of having "wedge-shaped pattern" centering pins. A34, at dependent claim 4.

The key elements contained in the asserted claims of the '776 and '633 Patents, and their respective locations in the patented CLIC system, are as follows:

## '776 Patent

| Claim Element | Location |
|---|---|
| 1. An anesthesia respiration system to absorber connection device, comprising: | -- |
| an absorber for connecting with the anesthesia | Canister |

| Claim Element | Location |
|---|---|
| respiration system, the absorber having an absorber housing, with a gas inlet opening concentrically arranged relative to a gas outlet opening on a front side of said absorber housing, as well as a guide plate; | |
| an anesthesia respiration system absorber mount, said guide plate being adapted to be pushed into said absorber mount; | Canister and Adapter |
| a centering notch provided on a front side of said guide plate in a direction of pushing in; and | Canister |
| a centering pin, which engages the centering notch and fixes the guide plate in an end position, said centering pin being fastened to said absorber mount. | Adapter |

**'633 Patent**

| Claim Element | Location |
|---|---|
| 1. A carbon dioxide absorber for a rebreathing system, the carbon dioxide absorber comprising: | -- |
| an absorber housing; | Canister |
| a guide plate on a front side of said absorber housing, said guide plate being pushed into said pivotable mount of said connection head; | Canister |
| guide plate gas ducts arranged concentrically at said guide plate | Canister |
| connection head gas ducts provided in said connection head and with a design corresponding to said guide plate gas ducts, said guide plate gas | Adapter |

13

| Claim Element | Location |
|---|---|
| ducts for connection to said connection head gas ducts | |
| guide grooves between said guide plate and said absorber housing for connecting said guide plate to said mount; | Canister |
| centering pins pointing in a direction of said absorber housing from said connection head; and | Adapter |
| centering means in one or more of said guide plate and said absorber housing, said centering means for meshing with said centering pins from said connection head; | Canister |
| said pivotable mount between a first position and a second position, said first position arranging said pivotable mount adjacent to said connection head, said second position arranging said pivotable mount spaced from said connection head and said centering pins. | Adapter |
| 2. A carbon dioxide absorber in accordance with claim 1, wherein said centering means comprises upper positioning grooves arranged opposite each other with corresponding said centering pins in an area of said guide grooves. | Canister |
| 3. A carbon dioxide absorber in accordance with claim 2, wherein said centering means further comprises lower positioning grooves at said absorber housing, said lower positioning grooves extending flush with said upper positioning grooves and for meshing with free ends of said centering pins. | Canister |

A19-20, A34-35.

The specification of the '776 Patent explains that the novelty of the invention lies in the connection between the CLIC adapter and CLIC canister:

> "The basic object of the present invention is to improve a device of the type mentioned such that the *quick connection system* between the anesthesia respiration system and the absorber makes possible a *gas-tight connection* in a simple manner. . . .
>
> The advantage of the present invention is essentially that the centering notch, which is pushed against the centering pin on the absorber mount, is provided on the front side of the guide plate, which is arranged at the absorber and is pushed into an absorber mount at the anesthesia respiration system."
> *Id.* at col.2, ll.12-16.

A18 at col.1, ll.63-67 (emphasis added); col.2, ll.12-16. The specification of the '633 Patent also describes the advantage of having "tightness" from the improved arrangement in the connection area:

> *Increased tightness* of the gas ducts is achieved *in the connection area* between the absorber and the connection head due to the improved centering of the absorber *in relation to* the connection head.

A32 at col.2, ll.21-24 (emphasis added). *See also id.* at col.2, ll.44-45 ("The centering pins are advantageously arranged opposite each other in the area of the guide grooves.").

Both parties' experts agree that the '633 Patent improved upon the '776 Patent. These improvements include, for example, (1) the use of two centering pins instead of one for a "more secure attachment," (2) "the design of the centering pins" themselves such that "they would engage the grooves of the canister" to reduce "alignment problems," and (3) "the positioning of the pins . . . 180 degrees from each other" to provide "more stability" and "more alignment accuracies than other arrangements of pins." A1047-48, A1096-97. These improvements ultimately work to prevent "leaks" in the configuration that could lead to a "buildup of carbon dioxide" in the bloodstream that could cause "dire consequences" such as "death" of the patient. A1099-1100.

### D.    Draeger Medical's Patented CLIC Products

Draeger Medical manufactures and sells high-quality, German-engineered medical and safety equipment under the "Dräger" name, including a successful line of Dräger anesthesia equipment and related products. A224-25. Dräger soda lime products are sold under the

Drägersorb® brand and come in several varieties, including "loose fill" soda lime, as well as soda lime that comes in "Drägersorb® CLIC" disposable canisters. A225. Drägersorb® CLIC canisters are used with the Dräger CLIC adapter to practice the asserted claims of Draeger Medical's '776 and '633 patents.

Draeger Medical often gives its CLIC adapters away for free with the expectation that customers purchase its CLIC canisters. A226, A272, A313, A508, A522, A523 (stating that "half of the customers that are using CLIC canisters are on some type of inventory agreement"). The primary (and sometimes sole) compensation that Draeger Medical receives for providing its CLIC adapters at no charge to its customers, is the customer's promise to later purchase Draeger Medical's CLIC canisters as part of a multi-year inventory agreement. *Id.* These inventory agreements generally commit a customer to purchasing a certain number of Draeger Medical CLIC canisters over a [        ] period. A966.

To the extent that Draeger Medical sells both CLIC adapters and canisters, the two are often sold separately through a contract for the supply of the canisters. A226, A272, A313, A508, A522, A523. The list price for the CLIC adapter is approximately [     ]. A453. The list price for

Draeger Medical's CLIC canisters is approximately [     ]. A263. Further,

there are instances where customers are contractually committed to a

"loose fill" contract and are thus unable to purchase the combination

immediately. A963.

For many customers, after the initial purchase or free receipt of

Draeger Medical's CLIC adapter, there is often no need to buy a second

adapter. A CLIC canister generally lasts two weeks before it must be

replaced, depending on usage, while a CLIC adapter generally lasts for

years. A525; *see* A274 (discussing length of inventory agreements). As such,

Draeger Medical's profits are driven by the sales of its CLIC canisters. *See*

A229-30 (discussing growth of canister sales). As part of Draeger Medical's

ongoing effort to increase its CLIC canister sales, Draeger Medical's CLIC

canister sales increased by [     ] from 2010 to 2011 and by [     ]

from 2011 to 2012. *Id.* Draeger Medical projected that its Drägersorb® CLIC

canister sales would be [     ] in 2012. *Id.*

### E.    Allied's Copied Products and Marketing Efforts

Allied obtained Draeger Medical's products, including an anesthesia

machine, a CLIC adapter, and pre-filled disposable CLIC soda lime

canisters, in approximately January of 2011, and specifically designed two

products mirroring the Drägersorb® CLIC canisters. A929; A917-28. These products were designed to fit perfectly with Dräger CLIC adapters and Allied marketed them as "Dräger Style" canisters to customers. *Id.*

Sometime within the year after the '633 Patent issued to Draeger Medical, Allied began selling its "Dräger Style" soda lime canisters, *i.e.* the "Dräger Style" Litholyme and Carbolime products (the "Accused Products"). A943. As the "Dräger Style" name explicitly states, Allied markets the Accused Products on the basis that they are specifically designed to work with the Dräger CLIC adapter, as a replacement for Drägersorb® CLIC canisters. A917, A954, A1145.

Unlike Draeger Medical, Allied has not expended considerable resources in research and development. Allied obtained and tested Draeger Medical's products at Allied's own facilities to ensure that its canisters would fit perfectly with Draeger Medical's CLIC adapters. A917-28. Allied designed its "Dräger Style" canisters to have the same manufacturing tolerances as Draeger Medical's own CLIC canisters. A399-426, A917-28. During the manufacturing process, Allied tests each of its "Dräger Style" canisters by connecting each canister to one of Draeger Medical's CLIC

adapters. A399-426. Allied agreed that its CLIC canisters were "knock-offs" of Draeger Medical's canisters. A942.

Beginning in the summer of 2013, Draeger Medical began to notice that Allied was taking business by undercutting Draeger Medical's prices. Numerous customers informed Draeger Medical's sales representatives that the choice between the Drägersorb® CLIC canisters and Allied's "Dräger Style" canisters came down to price. A263-65. Drager Medical's customers described Allied's pricing as "very aggressive," "half the price" of Drägersorb® CLIC canisters, and sometimes as low as $8 per canister. A212, A218, A263-64. As a result, Allied took significant business away from Draeger Medical. A211-13, A217-19, A226-30, A262-65, A270-74, A278-80. Draeger Medical subsequently filed this lawsuit against Allied and sought a preliminary injunction seeking to prohibit Allied from selling its "Dräger Style" Litholyme and Carbolime $CO_2$ canisters. A53-90.

### F.    The District Court's Denial of Draeger Medical's Preliminary Injunction

The district court's order denying Draeger Medical's motion for a preliminary injunction relied on the doctrine of permissible repair, without making a formal finding regarding patent exhaustion. *See* A1144-51. The

order stated that "[t]he question before the court is whether plaintiffs' sale of the patented combination implicates the doctrines of patent exhaustion and/*or* of permissible repair." A1147-48 (emphasis added). The court concluded that "the application of the doctrine of permissible repair is appropriate under the facts of this case." A1147. The court reasoned that the "circumstances at bar are analogous" to those examined in *Sage Products, Inc. v. Devon Industries, Inc.*, 45 F.3d 1575 (Fed. Cir. 1995). A1149. The district court assumed Draeger Medical only sold the "entire combination" without any formal fact-finding regarding actual sales. A1147; *see also* A1149 ("Clearly plaintiffs sell the patented combination . . . .").

## G.   The District Court's Grant of Allied's Summary Judgment Motion

The district court's ruling granting Allied summary judgment of non-infringement states Draeger Medical's

> adapters are provided to customers (1) at the 'initial capital sale' of a rebreathing system or (2) at no cost with a commitment to purchase an inventory of canisters. [citing A963-64.] In either scenario, plaintiffs' sales are in reality for the patented combination, i.e., an adaptor with at least one canister for insertion into a rebreathing system, which sale exhausts the patent.

21

A6-7. No specific findings of fact were made regarding amount of sales under either scenario, nor findings regarding how exactly Draeger Medical sells CLIC canisters or to whom Draeger Medical has actually sold both canisters and adapters. *See id.*

The district court's decision implies that Draeger Medical's independent sale of either a CLIC adapter or CLIC canister exhausts all claims of patent infringement. The court found exhaustion by explaining that neither the adapter nor the canister has any "reasonable non-infringing uses" and the "sale of either component is intended to persuade the customer to use the combination." A7. The court also stated that "the adapter and the canister each contain specific claimed features" and acknowledged the claims involve a "patented combination," yet concluded that "the patent is exhausted." *Id.*

Although the district court made a conclusion that Draeger Medical's patent rights are exhausted, it specifically noted that "it is not at all clear to the court that the issue of patent exhaustion must be specifically addressed before reaching the doctrine of permissible repair." A9 at n.5. The court determined that "the circumstances at bar are analogous to those examined

in *Sage*" and concluded "replacement of the canister is permissible repair."
*Id*. The court explained that "the parties rely on different paradigms for
their analyses, plaintiffs identifying *Quanta* and *Canon* as more analogous
to the facts of record, and defendant identifying *Aro* and *Sage* as the better
reasoned in the context of the facts of record." *Id*. "Consistent with the
decision denying plaintiffs' request for injunctive relief," the court
concluded "that the facts of record are more appropriately analyzed with
reference to the doctrine of permissible repair." A9-10.

## SUMMARY OF ARGUMENT

The district court erred by concluding that the sales of Dräger CLIC adapters and Drägersorb® CLIC canisters were all "combination" sales that exhausted Draeger Medical's patent rights as a matter of law, in light of the undisputed evidence that Draeger Medical often sells the two separately. Neither Draeger Medical's CLIC adapter, nor its CLIC canister, alone "substantially embody" the patented combination as required by the Supreme Court's decision in *Quanta Computer, Inc. v. LG Electronics, Inc.*, 553 U.S. 617 (2008) in order for a component sale to exhaust rights regarding a combination claim. It is undisputed that the inventive features in Draeger Medical's patents pertain to the interface and resulting connection between the adapter and the canister. Neither component contains "[e]verything inventive" within the patent, and neither component is a "standard part" as contemplated by *Quanta*. Independent sales of one component thus do not exhaust infringement claims even if the sale of either component is intended to persuade the customer to use the combination. Without a combination sale, Draeger Medical has never received compensation for its patented invention, and thus exhaustion or "first sale" doctrine should not apply.

24

The district court further erred as a matter of law in concluding that Allied could not be liable for any act of infringement simply because Draeger Medical sells CLIC adapters and CLIC canisters. The doctrine of patent exhaustion cannot excuse acts of contributory infringement by the making and selling of an element of a combination covered by a patent, such as Allied's selling of knock-off Dräger Style CLIC canisters, unless every instance of direct infringement has been excused by a first sale authorizing use of the patented combination. The court failed to make any specific finding as to how often Draeger Medical sold the patented combination together.

The district court also erred when it determined that noninfringement could alternatively be found under the doctrine of permissible repair. In order to reach the doctrine of permissible repair, a patent must first be shown to be exhausted. A permissible repair versus impermissible reconstruction analysis is not proper if there was no exhausting "first sale" initially.

Even if Allied had established that Draeger Medical's sales, or some of them, were exhausting sales of the patented combinations, Allied infringed Draeger Medical's patents by impermissibly selling novel components in

Draeger Medical's patented combination, thereby impermissibly reconstructing the patented technology. The district court erred when it determined that Allied permissibly repaired Draeger Medical's patented combination.

Because Allied's patent infringement is not excused by the doctrines of permissible repair or patent exhaustion, the judgment should be reversed as a matter of law.

# STANDARD OF REVIEW

Orders granting or denying summary judgment are reviewed *de novo*, and should be affirmed only when "there is no genuine issue as to any material fact and . . . the moving party is entitled to a judgment as a matter of law." *Crown Operations Int'l v. Solutia Inc.*, 289 F.3d 1367, 1375 (Fed. Cir. 2002) (internal quotations omitted) ("We review a district court's grant of summary judgment without deference."). Patent exhaustion and permissible repair are both legal questions based on underlying factual findings. *See Helferich Patent Licensing, LLC v. New York Times Co.*, 778 F.3d 1293, 1308-1309 (Fed. Cir. 2015) ("Patent exhaustion may be decided by summary judgment when there are no genuine disputes of material fact."); *Sage Prods.*, 45 F.3d at 1577 ("When there are no genuine issues of material fact, 'the question of whether the defendant's conduct constituted permissible repair is answerable as a question of law.'"). To the extent any of those underlying facts are in dispute, they "must be viewed in the light most favorable" to Draeger Medical. *Crown*, 289 F.3d at 1375 (citing *Poller v. Columbia Broad. Sys., Inc.*, 368 U.S. 464, 473 (1962)).

# ARGUMENT

## I.    DRAEGER MEDICAL'S PATENT RIGHTS ARE NOT EXHAUSTED BY SALES OF ITS CLIC ADAPTERS, OR CANISTERS, INDEPENDENTLY, AS THESE SALES ARE NOT "COMBINATION SALES."

Neither Draeger Medical's CLIC adapter, nor its CLIC canister, alone embody all inventive aspects of the combination patent claims, and thus independent sales of one product do not exhaust Draeger Medical's patent rights. Patent exhaustion applies when there is an "initial authorized sale of a patented item." *Quanta Computer, Inc. v. LG Electronics, Inc.*, 553 U.S. 617, 625 (2008). Under *Quanta*, where a component of a patented system is sold, but must be later combined with additional components, patent exhaustion exists only when the component "substantially embodies" the patented technology. *Quanta*, 553 U.S. at 632-33. The sale of an incomplete system, or the sale of various components, none of which substantially embodies combination patent claims, is insufficient to exhaust the patent. *Id.*

The only fact the district court found regarding Draeger Medical's sales was that Draeger Medical provides adapters to customers "(1) at the 'initial capital sale' of a rebreathing system or (2) at no cost with a

commitment to purchase an inventory of canisters." A6-7. The court made no separate findings regarding whether all those same customers in fact also purchased canisters from Draeger Medical, or whether Allied only made its canister sales to customers that had previously purchased both an adapter *and* canisters from Draeger Medical. *See id*. Thus the district court's exhaustion finding was premised on the idea that the sale, or free provision, of adapters alone by Draeger Medical to customers was sufficient to exhaust all its claims against Allied regarding infringement of its patents related to the combination. This was legal error because the adapter alone does not substantially embody the patent claims.

## A. Neither Component Alone "Substantially Embodies" the Patented Technology as Required by *Quanta* for Patent Exhaustion by Component Sales.

As the district court itself recognized, in this case "the combination patent is made up of the adapter and the canister." A6. Thus, the sale of either component alone cannot exhaust Draeger Medical's patent rights unless one of the components alone "substantially embodies" the patent claims.

Under *Quanta*, a component "substantially embodies" the patented technology when the component (1) has "no reasonable non-infringing

use" and (2) includes "all the inventive aspects of the patented methods." *Id.* Additional components that do not contain "inventive" features are merely "standard parts." *Id.* at 633. This Court recently highlighted this two-part inquiry in *Helferich Patent Licensing, LLC v. New York Times Co.*, 778 F.3d at 1308-1309 (analyzing each prong separately). In *Helferich*, this Court held that the second prong focused on "whether the additional steps needed to complete the invention from the product are themselves 'inventive' or 'noninventive.'" *Id.* at 1309. Although *Helferich* involved looking at "handset claims" and "content claims" to determine whether either set of claims encompassed "all the inventive aspects" of the invention, the *Helferich* analysis is applicable here: a component does not "substantially embody" the invention if additional components are themselves "inventive." *Id.*

As a matter of law, the independent sale of Dräger CLIC adapters or Drägersorb® CLIC canisters does not exhaust Draeger Medical's rights in the Asserted Patents because neither component alone has all the inventive aspects of the invention. The district court erroneously found patent exhaustion by reasoning that "[n]either component of the combination has any 'reasonable non-infringing uses'" without assessing next whether the

component at issue has all the inventive aspects of the claimed invention.

A7. The court's analysis failed to address this second requirement under

*Quanta*—that a component must have "all the inventive aspects" of the

invention before it can "substantially embody" that invention. *Quanta*, 553

U.S. at 633-34. Here, neither the Dräger CLIC adapter nor the Drägersorb®

CLIC canister "substantially embodies" the patented technology as

required by *Quanta*.

It is undisputed that the inventions in the Asserted Patents pertain to

the ***interface*** between the CLIC adapter and CLIC canister, rather than

features on one component that operate independent of the other. A11-20,

A21-35, A206, A1047-48, A1096-97, A1094-100. The '776 Patent claims a

number of novel features directed to the connection between the two

components, such as a "guide plate" with a "centering notch" on the CLIC

canister "adapted to be pushed into" the CLIC adapter, described as an

"absorber mount," with "a centering pin" that "engages" the centering

notch on the CLIC canister. A11-20. The specification of the '776 Patent also

demonstrates that the novelty lies in the connection between the CLIC

adapter and CLIC canister. A18. Likewise, the '633 Patent claimed several

improvements to the interface between the CLIC adapter and CLIC

canister, including, for example, multiple "centering pins" on the CLIC

adapter and "centering means for meshing with said centering pins" that

form a better connection between the CLIC adapter and CLIC canister.

A21-35. The specification of the '633 Patent also describes the advantage of

having "tightness" from the improved arrangement in the connection area.

A32. It is undisputed that one key feature of the invention is that the

adapter fits tightly with the canister, such that no "leaks" are present when

connecting the canister to the anesthesia machine. A206, A1099-1100.

Allied's conduct highlights the novelty of the interface between the

CLIC adapter and CLIC canister: Allied specifically designed, adapted, and

manufactured its canisters for use with Draeger Medical's CLIC adapters.

Allied conducted repeated tests to ensure that its canisters properly fit into

Draeger Medical's CLIC adapters. A399-426, A917-28. In fact, Allied tests

the fit of each of its canisters in a Draeger Medical adapter as part of its

quality control process. *Id.* Further, both Draeger Medical's and Allied's

experts agree that the novel, inventive feature of the patents is the interface

between the canister and the adapter, which was designed to avoid "dire

consequences for patients, including death." A1047-48, A1096-97, A1094-

100. Thus, the inventive feature in the Asserted Patents pertains to the

interface between the two components, rather than to either component individually.

Although the district court found that the sale of the CLIC adapter was intended to persuade customers to use the combination, A7, neither component contains everything inventive within the patent. Unlike the standard "memory and buses" in *Quanta*, Draeger Medical's CLIC adapter and CLIC canister each contain novel elements from the patented combination, all of which are necessary for the adapter and canister to properly align. The canister constitutes approximately half of the claimed components in the '633 Patent, including some of the very components that Allied's own expert contends contribute to the novelty of the '633 Patent. *See* Statement of the Case, Section C, *supra*.

Thus, unlike the *Quanta* products, the CLIC adapter and CLIC canister are substantially more than mere "standard component[s]" or inconsequential parts of the patented invention. *Cf. Quanta*, 553 U.S. at 634 (stating that all the inventive features were on the LG chip and not the standard computer components added later by Quanta). Neither individual component "substantially embodies" the claimed invention as

required by *Quanta* in order for the sale of an individual component to exhaust infringement claims.

### B. Component Sales Do Not Compensate Draeger Medical for Its Invention and Do Not Exhaust Infringement Claims.

The district court also incorrectly concluded that in either scenario of (1) Draeger Medical providing adapters to customers at the initial capital sale of a rebreathing system, or (2) providing adapters at no cost with a commitment to purchase an inventory of canisters, "plaintiffs' sales are in reality for the patented combination, i.e., an adapter with at least one canister for insertion into a rebreathing system, which sale exhausts the patent." A6-7. It is error to conclude that individual sales of adapters, or of canisters, is a combination sale simply because the "sale of either component is intended to persuade the customer to use the combination." A7. Individual adapter sales (or free giveaways) may be intended to persuade the customer to buy the combination, but unless the combination is actually bought from Draeger Medical, Draeger Medical receives no compensation for its invention. Importantly, Allied did not provide any evidence regarding how many customers actually purchased both CLIC canisters and CLIC adapters together from Draeger Medical, and the

district court made no factual finding regarding this issue. *See Fuji Photo Film Co. v. ITC*, 474 F.3d 1271, 1288 (Fed. Cir. 2007) (recognizing, in the ITC context, that "evidentiary problems" could preclude application of patent exhaustion for certain camera products).

In *LifeScan*, this Court analyzed a patent on "a method of comparing the measurements taken by two separate working electrodes" in a blood glucose meter using replaceable "test strips." *LifeScan Scotland, Ltd. v. Shasta Technologies, LLC*, 734 F.3d 1361, 1364-65 (Fed. Cir. 2013). The method claims required "both a meter and a test strip for an individual to practice it." *Id.* at 1365. The patentee sold both glucose meters and test strips under its "OneTouch Ultra" brand. *Id.* The patentee gave meters away for free "in the expectation and intent that customers will use its OneTouch Ultra meters with [its] OneTouch Ultra test strips, from which [it] derive[s] a profit." *Id.*

Even though the patentee sold both components required by the patent, this Court did not end the exhaustion inquiry there. Instead, the *LifeScan* Court analyzed whether the meters substantially embodied the patent. *Id.* at 1369. Based on the "undisputed facts," "the specification of the patent," and the "prosecution history," this Court found that the meters

35

alone embodied "the claimed inventive concept" of the patent, *id.* at 1370, and therefore held sale of the meters alone exhausted infringement claims related to use of those meters. *Id.* at 1374.

Here, like in *LifeScan*, Draeger Medical separately sells its CLIC adapters and CLIC canisters. Draeger Medical often gives its CLIC adapters away for free with the expectation that customers purchase its CLIC canisters, similar to the patentee's motivation for giving away free OneTouch Ultra glucose meters in *LifeScan*. *Id.* at 1365. Unlike in *LifeScan*, however, the given-away component here does not substantially embody the invention as detailed in Section I.A above. Thus, simply by selling or giving away an adapter, which is not the patented combination article, Draeger Medical has not authorized the recipient to use its combination invention and the exhaustion doctrine cannot excuse Allied's contributory infringement.

The dissenting opinion in *LifeScan* recognized the problem inherent in allowing Allied to copy and market Draeger Medical's CLIC canisters. Here, Draeger Medical, like the patentee in *Lifescan*, "received little to nothing in return" for giving away CLIC adapters and any purported

"future benefit" would be "speculative and entirely theoretical." *Id.* at 1381.

When a customer receives Draeger Medical's CLIC adapter for free, and purchases Allied's "Dräger style" CLIC canisters instead of purchasing Draeger Medical's CLIC canisters, Draeger Medical "receives no reward whatsoever" for its patented combination. *Id.* at 1383. The "patent exhaustion" or "first sale" doctrine was never intended to preclude patentees from enforcing their patent rights where they were never compensated for and subsequently did not authorize specific uses of their invention. *See Keurig, Inc. v. Sturm Foods, Inc.*, 732 F.3d 1370, 1373 (Fed. Cir. 2013) ("The rationale underlying the doctrine rests upon the theory that an unconditional sale of a patented device exhausts the patentee's right to control the purchaser's use of that item thereafter because the patentee has bargained for and received full value for the goods."); *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 377 U.S. 476, 497 (1964) ("*Aro II*") ("When the patentee has sold the patented article or authorized its sale and has thus granted to the purchaser an 'implied license to use,' it is clear that he cannot thereafter that use; so far as the use of it was concerned, the patentee had received his consideration . . . .") (internal quotation omitted);

37

*id.* at 499-500 (discussing how previous cases indicated what was important in whether Aro should be liable for replacement component sales was whether patentee had already received "compensation for the use of the patented structures"); *Aro Mfg. Co. v. Convertible Top Replacement Co.*, 365 U.S. 336, 359 (1961) ("*Aro I*") ("The established policy in this Nation for more than a century has been that when an article described in a patent is **sold** and passes to the hands of the purchaser, it is no longer within the limits of the monopoly.") (internal quotation omitted) (emphasis added); *United States v. Univis Lens Co.*, 316 U.S. 241, 251 (1942) ("Our decisions have uniformly recognized that the purpose of the patent law is fulfilled with respect to any particular article when the patentee has received his reward for the use of his invention by the sale of the article."); *United States v. Masonite Corp.*, 316 U.S. 265, 278 (1942) ("The test has been whether or not there has been such a disposition of the article that it may fairly be said that the patentee has received his reward for the use of the article.").

As a matter of law, sales of the Draeger Medical's CLIC adapter and CLIC canister, independently, do not exhaust Draeger Medical's rights in the Asserted Patents. A sale of one component is not a sale of the patented combination article covered by the Asserted Patents. The district court

38

erred by finding that the sale of Draeger Medical's CLIC adapter, regardless of whether sold independently or together with Draeger Medical's CLIC canisters, exhausted Draeger Medical's patents. Neither component contains "everything inventive" within the patent such that they "substantially embody" the patented combination. The district court improperly assumed that all of Draeger Medical's sales were "combination" sales.

No facts have been found as to how many Allied customers have actually purchased and compensated Draeger Medical for use of its patented *combination*. The district court noted that one situation in which adapters are provided by Draeger Medical is "at no cost with a commitment to purchase an inventory of canisters." A6. Whether the adapter is provided at the initial capital sale of a rebreathing system or separately, Draeger Medical is only compensated for its patented combination invention through the customer's promise to purchase Draeger Medical's CLIC canisters as part of a multi-year inventory agreement. A226, A272, A313, A508, A522, A523. As Draeger Medical's sample customer contract shows, Draeger Medical provides adapters to customers when they promise to buy several years' worth of CLIC

canisters from Draeger Medical. A973-75. If customers fail to purchase the required inventory of canisters, they are to "return[] the CLIC Adapters" or purchase the adapters at a new price. A974.

Unless a customer has actually complied with the contractual terms of sale from Draeger Medical for its purchase of the combination from Draeger Medical, that customer's use of the combination cannot be considered authorized. The inventory agreements place a condition on the purchaser's use of the patented combination. *See Mallinckrodt, Inc. v. Medipart, Inc.*, 976 F.2d 700, 706 (Fed. Cir. 1992) (stating that "the sale of patented goods, like other goods, can be conditioned"). "The rule is, with few exceptions, that any conditions which are not in their very nature illegal with regard to this kind of property, imposed by the patentee and agreed to by the licensee for the right to . . . use . . . the [patented] article, will be upheld by the courts." *Id.* at 703 (quoting *E. Bement & Sons v. National Harrow Co.*, 186 U.S. 70, 91 (1902)) (alteration in original).

The district court made no findings of fact about how many Allied customers have actually purchased even one adapter and at least one canister from Draeger Medical. Moreover, Allied put forth no undisputed facts, and the district court found none, about how many Allied customers

40

purchased an adapter *and* complied with their contractual commitments to compensate Draeger Medical for the patented invention by purchasing the required inventory of canisters from Draeger Medical. As such, there are genuine disputes of material fact remaining that necessitate reversal of the district court's decision. *See Helferich*, 778 F.3d at 1308-1309 (evaluating exhaustion during summary judgment).The district court's decision should be reversed.

## II.   THE DISTRICT COURT ERRED BY ASSUMING THAT THE SINGLE SALE OF A PATENTED COMBINATION EXHAUSTS PATENT RIGHTS AS TO ALL INSTANCES OF INFRINGEMENT.

Patent exhaustion restricts a patentee's rights only as to the "particular article" sold. *Bowman v. Monsanto*, 133 S. Ct. 1761, 1766 (2013). When someone makes an authorized purchase of a patented article from the patentee or other licensed seller, their use is authorized and there can be no claim for direct infringement against them. *See Aro II*, 377 U.S. at 483-84. Similarly, there can be no contributory infringement against a seller of replacement parts for its sale of a replacement part to that authorized end user for use in its purchased article. *Id.* However, "[t]he right of one, other than the patentee, furnishing repair parts of a patented combination, can be no greater than that of the user, and he is bound to see that no other use of

41

such parts is made than that authorized by the user's license." *Id.* at 487(citation omitted). Thus, "where one [like Allied] makes and sells one element of a combination covered by a patent with the intention and for the purpose of bringing about its use in such a combination, he is guilty of contributory infringement and is equally liable to the patentee" as a direct infringer who actually makes the patented combination without prior authorization from the patentee. *Id.* at 486-87.

Allied's acts of selling Dräger Style canisters to customers, who directly infringe the claims by combining the Allied canisters with Draeger Medical CLIC adapters, contribute to and/or induce infringement by the customers. Allied did not show, nor did the district court make any specific finding, that every customer to which Allied sold Dräger Style canisters, had already purchased a "combination" from Draeger Medical. As the Supreme Court discussed in *Aro II*, 35 U.S.C. 271(c) was intended to "hold liable for contributory infringement a supplier of replacement parts specially designed for use in the repair of infringing articles." 377 US. at 486.

In instances where Allied's customers have not been previously authorized to use the patented combination through their purchase of a

combination article from Draeger Medical, Allied's contributory infringement cannot be excused through the doctrine of patent exhaustion. *See id.* at 485-88. In addition, Allied's acts of making the patented combination through its combination of a Draeger Medical adapter with its own copied CLIC canisters in order to test its canisters, A399-A426, A917-28, also would be acts of direct infringement not authorized by any prior sale by Draeger Medical to Allied of the patented combination.

Granting Allied summary judgment of non-infringement based on conclusion "that the patent is exhausted," A7, was error. Only particular instances of infringement related to a purchaser's use of a particular authorized article which would otherwise be direct infringement could be excused by patent exhaustion doctrine. However, the district court did not even make any factual findings regarding particular purchasers or sales. As such, it was improper for the district court to determine that Allied could not be liable for any act of infringement. There are genuine disputes of material fact remaining that necessitate reversal of the district court's decision. *See Helferich*, 778 F.3d at 1308-09 (evaluating exhaustion during summary judgment). The district court's decision granting Allied's

summary judgment should be reversed, and the case remanded for further proceedings.

## III. THE DISTRICT COURT ERRED TO THE EXTENT IT HELD THE DOCTRINE OF PERMISSIBLE REPAIR SUPPORTED ITS DECISION IN THE ABSENCE OF AN EXHAUSTING FIRST SALE.

Permissible repair "only applies to products whose patent rights have been exhausted through a first sale in the United States." *Fuji Photo*, 474 F.3d at 1293 (citing *Jazz Photo Corp. v. ITC*, 264 F.3d 1094, 1105 (Fed. Cir. 2001)). Only after establishing that products were the subject of an exhausting first sale in the United States should the analysis turn to whether the accused conduct is permissible repair or impermissible reconstruction. *Fuji Photo*, 474 F.3d at 1288. The distinction between repair and reconstruction is tied to whether the accused infringer is constructing "an essentially new article on the template of the original . . . ." *Jazz Photo*, 264 F.3d at 1102. This is because the "second creation of the patented entity . . . exceeds the rights that accompanied the initial sale." *Id.* at 1105.

The district court here concluded that "the parties rely on different paradigms for their analyses" and noted that "the facts of the record are more appropriately analyzed with reference to the doctrine of permissible repair." A9-10. In doing so, the district court improperly divorced its

analysis of permissible repair from an exhaustion inquiry. It was error to analyze non-infringement under "the doctrines of patent exhaustion and/*or* of permissible repair," A1147-48 (emphasis added),[2] because an exhausting first sale must be present before the doctrine of permissible repair even presents a relevant inquiry. The district court erroneously conducted its analysis "with reference to the doctrine of permissible repair . . . ." A9-10. Because the district court improperly applied and relied on the doctrine of permissible repair, this Court should reverse the non-infringement finding.

This Court has repeatedly required a showing of patent exhaustion before reaching the question of permissible repair. In *Fuji Photo*, this Court adopted a "***two-part test defining permissible repair***" requiring proof that the cameras at issue were "first sold in the U.S. so as to exhaust U.S. patent rights" and second, "proof that the cameras were repaired rather than reconstructed." 474 F.3d at 1288 (Fed. Cir. 2007) (emphasis added). In

---

[2] The district court explained that its summary judgment analysis was "[c]onsistent with the decision denying plaintiffs' request for injunctive relief . . . ." A9-10. The court, in that order denying plaintiff's request for injunctive relief, framed the issue as "whether plaintiffs' sale of the patented combination implicates the doctrines of patent exhaustion and/*or* of permissible repair." A1147-48 (emphasis added).

*Surfco Hawaii v. Fin Control Systems Pty. Ltd.*, this Court explained that "the right of 'repair' ***follows*** from the exhaustion of a patentee's right to control the disposition of a patented article after it has been sold." 264 F.3d 1062, 1066 (Fed. Cir. 2001) (emphasis added). In *Jazz Photo*, this Court recognized that "[u]nderlying the repair/reconstruction dichotomy is the principle of exhaustion of the patent right." 264 F.3d at 1105.

As this Court has previously required, the district court must initially determine that an exhausting first sale occurred in the United States before it can find permissible repair. This exhausting first sale must comport with all of the elements of patent exhaustion. This framework is consistent with the Supreme Court's decision in *Aro I*, where the Court cited Judge Learned Hand to explain the underlying proposition: "The [patent] monopolist cannot prevent those to whom he ***sells*** from . . . reconditioning articles worn by use, unless they in fact ***make a new article***." 365 U.S. at 343 (citing *United States v. Aluminum Co. of Am.*, 148 F.2d 416, 425 (2d Cir. 1945) (emphasis added)).

The district court erred when it granted summary judgment of non-infringement based on the defense of permissible repair absent finding all Allied's alleged acts of direct, induced, and contributory infringement were

all negated by first sales by Draeger Medical of the patented combination to every direct infringer. The district court made no such findings, and, as discussed in Section II above, could not have properly made such findings, particularly on summary judgment, given the facts of record. The district court's decision, therefore, should be reversed.

## IV.  THIS CASE CONSTITUTES IMPERMISSIBLE RECONSTRUCTION AND NOT PERMISSIBLE REPAIR.

Even if the Court determines that all, or some of, Draeger Medical's sales constitute exhausting first sales, it should reverse the district court's ruling of non-infringement because Allied's conduct causes impermissible reconstruction and not permissible repair. Impermissible reconstruction includes replacing one component of a patented combination with a "substantially new" version. *Cotton-Tie Co. v. Simmons*, 106 U.S. 89, 94 (1882). The purchaser of a patented article may not reconstruct it through a "second creation" of that article. *Canon, Inc. v. GCC Int'l, Ltd.*, 263 Fed. Appx. 57, 61-62 (Fed. Cir. 2008). In contrast, permissible repair is permissible if the extent of the refurbishment that occurs is not "disproportionate to the overall value of the parts that were not replaced." *Id.*; *see also Surfco*, 264 F.3d at 1066 (citing *Aro I*, 365 U.S. at 346 (The new

owner of a patented article may only "use, repair, and modify the device as long as there is not 'reconstruction of the entity as to in fact make a new article.'")). The district court's permissible repair finding is "a legal determination" that is "reviewed without deference." *Jazz Photo*, 264 F.3d at 1099.

Here, the district court erred by finding that replacing Draeger Medical's Drägersorb® CLIC canisters with Allied's "Dräger Style" canisters constituted permissible repair rather than impermissible reconstruction of the patented combination. In *Bowman*, the Supreme Court refused to find Monsanto's patent rights regarding Roundup Ready soybean seeds exhausted as to a farmer who initially purchased such seeds from an authorized Monsanto dealer but later regrew seeds from the purchased seeds. The Court discussed the doctrine of patent exhaustion and the related concept of impermissible reconstruction, explaining:

> [T]he [exhaustion] doctrine restricts a patentee's rights only as to the "particular article" sold …; it leaves untouched the patentee's ability to prevent a buyer from making new copies of the patented item. . . . Rather, "a second creation" of the patented item calls the monopoly, conferred by the patent grant, into play for a second time. . . . That is because the patent holder has "received his reward" only for the actual article sold, and not for

48

> subsequent recreations of it. … If the purchaser of that article could make and sell endless copies, the patent would effectively protect the invention for just a single sale. . . . [I]f simple copying were a protected use, a patent would plummet in value after the first sale of the first item containing the invention. The undiluted patent monopoly, it might be said, would extend not for 20 years (as the Patent Act promises), but for only one transaction. And that would result in less incentive for innovation than Congress wanted. Hence our repeated insistence that exhaustion applies only to the particular item sold, and not to reproductions.

133 S.Ct. at 1766, 1768 (quotations omitted). In *Cotton-Tie Co. v . Simmons*, the Supreme Court assessed whether a patentee's sale of cotton-bale ties consisting of a buckle and a band exhausted patent rights covering the same. 106 U.S. at 94. There, the defendants repurposed used buckles and combined them with refurbished "bands made by piercing together several pieces of the old bands." *Id.* at 93. The Court rejected the defendants' permissible repair argument and explained that "[w]hatever right the defendants could acquire to the use of the old buckle, they acquired no right to combine it with a substantially new band, to make a cotton-bale tie." *Id.* at 93-94. Like the accused infringer in *Cotton-Tie*, Allied's new "Dräger Style" canisters were designed to replace Draeger Medical's own CLIC canisters for use with Draeger Medical's CLIC adapters. Such

replacement is reconstruction rather than repair. By getting rid of a Draeger Medical canister and replacing it with an Allied canister, the user has gotten rid of Draeger Medical's "article" and instead created a new unauthorized item. If such reproduction is considered mere repair, Draeger Medical is deprived of its right to compensation for each new making of its patented absorber connection system.

The district court's analysis that such should be considered repair rather than reconstruction is incorrect because: (1) the CLIC canister is responsible for a significant percentage of the monetization of the patented combination and therefore cannot be a permissible repair of the patented combination, and (2) replacement of these canisters is impermissible reconstruction consistent with the Court's ruling in *Canon*. This Court held in *Canon* that refurbishment is not permissible repair if it is "disproportionate to the overall value of the parts that were not replaced." 263 Fed. Appx. at 61-62. Although the concept of proportionality is less pertinent in the case of "readily replaceable parts," a component is not a "readily replaceable part" if it constitutes the "bulk of the value of the patented item." *Id.* at 61.

Thus, the proper reconstruction-repair analysis must account for whether the replaced component disproportionately drives the bulk of the value of the patented combination, such that it is not simply a "readily replaceable part." *Id.* This proportionality analysis focuses on the monetary value of the component compared to that of the patented combination, and is distinct from the "essential" component or "heart of the invention" test rejected by the Supreme Court in *Aro I. Husky Injection Molding Sys. v. R&D Tool & Eng'g Co.*, 291 F.3d 780, 786 (Fed. Cir. 2002). In *Husky*, this Court acknowledged *Aro I*'s rejection of an "essential" component or "heart of the invention" test, but found "there may be some concept of proportionality inherent in the distinction between repair and reconstruction." 291 F.3d at 786-87 (reasoning that "few would argue that the retention of the spark plugs and the replacement of the remainder of the car at a single stroke was permissible activity akin to repair").

The district court misapplied the law relating to proportionality in rejecting Draeger Medical's argument that the canister "dominates the monetization and valuation of the patented technology." A9 at n.6. The district court explained its rejection by citing *Canon* for the proposition that "the concept of proportionality [of the value of the replaceable part] is

51

pertinent, though less so in the case of readily replaceable parts." 263 Fed.

Appx. at 61-62. In doing so, the court improperly assumed the CLIC

canisters are "readily replaceable parts" and ignored the very evidence that

established that CLIC canisters were not a "readily replaceable part"—that

the CLIC canister, not the CLIC adapter, dominates the monetization and

valuation of the patented technology.

The CLIC canister is the most profitable component of the invention at

issue here. The value derived from canisters sold during the life of a single

CLIC adapter dwarfs the price for the CLIC adapter itself. Thus, Draeger

Medical's profits related to its patented combination are disproportionately

driven by sales of the CLIC canisters. In fact, the primary (and sometimes

sole) compensation that Draeger Medical receives for providing its CLIC

adapters at no charge to its customers, is the customer's promise to later

purchase Draeger Medical's CLIC canisters as part of a multi-year

inventory agreement. A226, A272, A313, A508, A522-23, A966. These

inventory agreements demonstrate that Draeger Medical often provides

CLIC adapters for free in exchange for the customers' commitment to

purchase CLIC canisters from Draeger Medical in the future. *Id.* Allied's

decision to copy the CLIC canister, rather than the adapter, also evidences the greater value of canister sales.

The district court's ruling essentially deprived Draeger Medical from obtaining the full value of its patented technology. Draeger Medical's sales of its CLIC canisters drive the revenue from the patented technology. *See* A229-30 (discussing growth of canister sales). There is often no need for customers to buy a second CLIC adapter after the initial purchase or free receipt of the adapter. Draeger Medical does not receive full compensation for its invention where customers purchase Allied's "Dräger Style" replacement canisters instead of Draeger Medical's own CLIC canisters.

Contrary to the district court's statement that "the circumstances at bar are analogous to those examined in *Sage*," A9, Allied's replacement of Draeger Medical's CLIC canisters is reconstruction more akin to facts in the *Canon* case than the situation in *Sage Products*. In *Canon*, the patentee sold laser printers and fax machines with replaceable toner cartridges. 263 Fed. Appx. at 60. The defendant sold replacement cartridges for use with the patentee's printers and fax machines. *Id.* The Court noted that "there is a reasonably debatable question of whether Claim 58 should be construed to cover the cartridge alone or the cartridge as part of a combination." *Id.* at

61. The Court explained that "the most likely combination would be one consisting of the toner cartridge and a claimed "hole defined by twisted surfaces" on the printer or fax machine for receiving a projection at the end of the cartridge. *Id.* Under this construction, the district court rejected the defendant's permissible repair defense and found that the patentee had a likelihood of success on its infringement claim. *Id.* at 62. This Court subsequently affirmed and found that a "second creation" of the patented technology occurred when replacing the defendant's toner cartridges with copycat cartridges. *Id.*

The present case, like *Canon*, also involves a combination patent with two components that interface together. In both cases, the patents cover the combination without separately claiming their individual components. In both cases, the component being copied by the defendant "constitutes the bulk of the value of the patented item." *Id.* at 61. This replacement is thus a "second creation" of the patented technology and is more akin to impermissible reconstruction than permissible repair. *Id.*

The opinion of *Sage Products, Inc.* is distinguishable from the underlying record in this case. *See Sage Prods.*, 45 F.3d 1575. In *Sage Products*, the patentee sold the claimed disposable system, with a

54

permanent outer container and with an inner container already installed and in need of replacement when filled. *Id.* at 1577. In contrast, Draeger Medical often provides CLIC adapters and canisters separately, and it is often the case that the adapter and canister's only connection is through a contract for the supply of the canisters. A226, A272, A313, A508, A522-23, A966. Further, the patentee in *Sage* did "not suggest that replacing a damaged inner container is reconstruction" and instead argued that there was a dispute about whether "undamaged containers were in fact spent, used up, or in need of repair at all as a result of being filled with medical waste." *Id.* at 1578. Here, unlike the patentee in *Sage Products*, Draeger Medical has argued repeatedly that the replacement of Draeger Medical's CLIC canisters is impermissible reconstruction.

Likewise, the factual record is distinguishable from *Aro*. In *Aro*, the patent generally concerned convertible top structures and claimed a combination of a "flexible top fabric, supporting structures, and a mechanism for sealing the fabric against the side of an automobile in order to keep the rain out." 365 U.S. at 337. The Supreme Court addressed in *Aro I* the issue of whether replacing the fabric was permissible repair or impermissible reconstruction. The Court specifically noted that "[t]he

patent makes no claim to invention based on the fabric or on its shape, pattern, or design." *Id.* at 339. The Court concluded that the replacement of the fabric, by individuals who previously purchased licensed complete convertible structures, must therefore be characterized as permissible repair. *Id.* at 346; *see also id.* at 341, 347; *Aro II*, 377 U.S. at 480-87. By contrast, Draeger Medical's patents include novel claim elements specifically directed to the canister and how it interfaces with the adapter. Replacing Draeger Medical's CLIC canisters is not mere repair permitted by *Aro*.

Thus, even if Allied had established that Draeger Medical's sales were "exhausting," given the disproportionate value derived from the canisters incorporating novel features of Draeger Medical's invention, Allied's sales of replacement canisters should be considered acts of impermissible reconstruction not permissible repair. The district court erred when it determined that Allied permissibly repaired Draeger Medical's patented combination and the court's decision should be reversed.

## CONCLUSION

For the foregoing reasons, the district court's grant to Allied of non-infringement on summary judgment should be vacated. The case should be remanded for further proceedings.

Dated: July 15, 2015                    Respectfully submitted,

_____

Cyrus A. Morton
Angela M. Muñoz-Kaphing
Li Zhu
Brenda L. Joly
**ROBINS KAPLAN LLP**
2800 LaSalle Plaza
800 LaSalle Avenue
Minneapolis, MN 55402-2015
Telephone: 612-349-8500
Facsimile: 612-339-4181

*Attorneys for Plaintiffs-Appellants Dräger
Medical GmbH et al.*

# ADDENDUM

# TABLE OF CONTENTS
# TO ADDENDUM

**Page**

## JUDGMENTS AND ORDERS APPEALED FROM

Judgment Appealed From ……………………………………………..... A1

Opinion Granting Defendant's Motion for Summary Judgment and Order
of March 27, 2015 …………………………………………………. A2


## PATENTS-IN-SUIT

U.S. Patent No. 7,487,776 ……………………………………………….. A11

U.S. Patent No. 8,286,633 ……………………………………………….. A21

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DRÄGER MEDICAL GMBH, a German Corporation; DRAEGER MEDICAL SYSTEMS, INC. and DRAEGER MEDICAL INC., Delaware corporations, <br><br> Plaintiffs, <br><br> v. <br><br> ALLIED HEALTHCARE PRODUCTS, INC., a Delaware corporation, <br><br> Defendant. | ) ) ) ) ) ) ) ) Civ. No. 13-1656-SLR ) ) ) ) ) |

**JUDGMENT IN A CIVIL CASE**

For reasons stated in the court's memorandum and order of March 27, 2015;

IT IS ORDERED AND ADJUDGED that judgment be and is hereby entered in favor of defendant and against plaintiffs.

_____
United States District Judge

Dated: 3/27/2015

_____
(By) Deputy Clerk

10

**A-1**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| DRÄGER MEDICAL GMBH, a German ) Corporation; DRAEGER MEDICAL ) SYSTEMS, INC. and DRAEGER ) MEDICAL INC., Delaware corporations, ) ) Plaintiffs, ) ) v. ) ) ALLIED HEALTHCARE PRODUCTS, ) INC., a Delaware corporation, ) ) Defendant. ) | Civ. No. 13-1656-SLR |

**O R D E R**

At Wilmington this 27th day of March 2015, consistent with the memorandum

issued this same date;

IT IS ORDERED that defendant's motion for summary judgment of non-

infringement (D.I. 93) is granted.

IT IS FURTHER ORDERED that the Clerk of Court is directed to enter judgment

in favor of defendant and against plaintiffs.

United States District Judge

**A-2**

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF DELAWARE

DRÄGER MEDICAL GMBH, a German )
Corporation; DRAEGER MEDICAL )
SYSTEMS, INC. and DRAEGER )
MEDICAL INC., Delaware corporations, )
)
        Plaintiffs, )
)
v. )     Civ. No. 13-1656-SLR
)
ALLIED HEALTHCARE PRODUCTS, )
INC., a Delaware corporation, )
)
        Defendant. )

**MEMORANDUM**

At Wilmington this ᔐᵗʰ day of March, 2015, having reviewed defendant Allied

Healthcare Products, Inc.'s ("defendant") motion for summary judgment (D.I. 93), and

the papers filed in connection therewith; the court issues its decision based on the

following reasoning:

1. **Background.** On October 4, 2013, plaintiffs Dräger Medical GMBH, Draeger

Medical Systems, Inc., and Draeger Medical, Inc. (collectively, "plaintiffs") filed the

instant action against defendant alleging infringement of United States Patent Nos.

8,286,633 ("the '633 patent") and 7,487,776 ("the '776 patent") (collectively, "the

patents-in-suit"). (D.I. 1) Defendant answered the complaint on October 28, 2013 and

counterclaimed for non-infringement and invalidity of the patents-in-suit. (D.I. 22) On

November 21, 2013, plaintiffs answered the counterclaims. (D.I. 44) The court denied

plaintiffs' motion for preliminary injunction on March 24, 2014. (D.I. 87; D.I. 88) The

court has jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a).

2. **Standard.** "The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of demonstrating the absence of a genuine issue of material fact. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 415 U.S. 574, 586 n.10 (1986). A party asserting that a fact cannot be—or, alternatively, is—genuinely disputed must support the assertion either by citing to "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for the purposes of the motions only), admissions, interrogatory answers, or other materials," or by "showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact." Fed. R. Civ. P. 56(c)(1)(A) & (B). If the moving party has carried its burden, the nonmovant must then "come forward with specific facts showing that there is a genuine issue for trial." *Matsushita*, 415 U.S. at 587 (internal quotation marks omitted). The court will "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000).

3. To defeat a motion for summary judgment, the non-moving party must "do more than simply show that there is some metaphysical doubt as to the material facts." *Matsushita*, 475 U.S. at 586-87; *see also Podohnik v. U.S. Postal Service*, 409 F.3d 584, 594 (3d Cir. 2005) (stating party opposing summary judgment "must present more than just bare assertions, conclusory allegations or suspicions to show the existence of a genuine issue") (internal quotation marks omitted). Although the "mere existence of

2

**A-4**

some alleged factual dispute between the parties will not defeat an otherwise properly

supported motion for summary judgment," a factual dispute is genuine where "the

evidence is such that a reasonable jury could return a verdict for the nonmoving party."

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).  "If the evidence is merely

colorable, or is not significantly probative, summary judgment may be granted." Id. at

249-50 (internal citations omitted); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322

(1986) (stating entry of summary judgment is mandated "against a party who fails to

make a showing sufficient to establish the existence of an element essential to that

party's case, and on which that party will bear the burden of proof at trial").

    4.  **Analysis.**  The '633 patent,[1] titled "Carbon Dioxide Absorber for a

Rebreathing System," issued to Dräger Medical GmbH on October 16, 2012.  The basic

object of the '633 patent is "to improve a carbon dioxide absorber such that it can be

connected to the connection head of a rebreathing system in a simple manner."  ('633

patent, col. 1:51-53)  Consistent with the inventive thrust of the patent, the carbon

dioxide absorber disclosed in claim 1 comprises:

> a connection head at the rebreathing system, said connection head
> including a pivotable mount;
> an absorber housing;
> a guide plate on a front side of said absorber housing, said guide
> plate being pushed into said pivotable mount of said connection head;
> guide plate gas ducts arranged concentrically at said guide plate;
> connection head gas ducts provided in said connection head and
> with a design corresponding to said guide plate gas ducts, said guide plate
> gas ducts for connection to said connection head gas ducts;
> guide grooves between said guide plate and said absorber housing
> for connecting said guide plate to said mount;
> centering pins pointing in a direction of said absorber housing from
> said connection head; and

---

[1] The parties have stipulated that the analysis regarding permissible repair and patent
exhaustion as to the '633 patent applies equally to the '776 patent.  (D.I. 91; D.I. 94 at 1)

> centering means in one or more of said guide plate and said
> absorber housing, said centering means for meshing with said centering
> pins from said connection head;
>     said pivotable mount being pivotable between a first position and a
> second position, said first position arranging said pivotable mount adjacent
> said connection head, said second position arranging said pivotable
> mount spaced from said connection head and said centering pins.

('633 patent, col. 5:62-6:21)  The '633 patent is a combination patent which includes a

connection head[2] ("adapter") which is part of a rebreathing system, and a housing[3]

("canister") to be inserted and removed from the adapter of the rebreathing system.

Defendant does not sell this combination; it sells the housing in the form of the

replacement canisters.

    5. [T]he doctrine of patent exhaustion . . . limit[s] the patent rights that survive

the initial authorized sale of a patented item." *Quanta Computer, Inc. v. LG Electronics,*

*Inc.*, 553 U.S. 617, 621 (2008).  "[T]he right to vend is exhausted by a single,

unconditional sale, the article sold being thereby carried outside the monopoly of the

patent law and rendered free of every restriction which the vendor may attempt to put

upon it."  *Id.* at 626 (citing *Motion Picture Patents Co. v. Universal Film Mfg. Co.*, 243

U.S. 502, 516 (1917).  In the case at bar, the combination patent is made up of the

adapter and the canister.  With regard to the sales of the patented combination,

plaintiffs explain that the adapters are provided to customers (1) at the "initial capital

sale" of a rebreathing system or (2) at no cost with a commitment to purchase an

inventory of canisters.  (D.I. 97 at 9)  In either scenario, plaintiffs' sales are in reality for

---

[2] With a pivotable mount and centering pins.

[3] With a guide plate, guide grooves and centering means.

4

**A-6**

the patented combination, i.e., an adaptor with at least one canister for insertion into a rebreathing system, which sale exhausts the patent.

6. Alternatively, "the traditional bar on patent restrictions following the sale of an item applies when the item sufficiently embodies the patent—even if it does not completely practice the patent—such that its only and intended use is to be finished under the terms of the patent." *Quanta*, 553 U.S. at 628. While the adapter and the canister each contain specific claimed features, each is specifically designed to function with the other element of the patented combination. Neither component of the combination has any "reasonable non-infringing uses," as exemplified by plaintiffs' business model — efforts to sell multi-year contracts for canisters. The sale of either component is intended to persuade the customer to use the combination. The court concludes that the patent is exhausted.[4]

7. "Originating in the principle of exhaustion of the patent right after first sale, the general rule of the doctrine of permissible repair is that 'while the ownership of a patented article does not include the right to create a substantially new article, it does include the right to preserve the useful life of the original article.'" *Surfco Hawaii v. Fin Control Systems Pty, Ltd.*, 264 F.3d 1062, 1065 (Fed. Cir. 2001) (quoting *Jazz Photo Corp. v. Int'l Trade Comm'n*, 264 F.3d 1094, 1102 (Fed. Cir. 2001)). Once a patented product is purchased, the customer has an implied license to use it, including the right to repair the patented article or purchase replacement parts from others. *See, e.g., Aro*

---

[4] The parties advance the same general arguments that were presented at the preliminary injunction stage of the case at bar. Indeed, the court's analysis of this issue remains largely the same and concludes that the patent is exhausted.

5

**A-7**

*Manufacturing Co. v. Convertible Top Replacement Co.*, 365 U.S. 336 (1961).  As

explained by the Supreme Court in *Aro*,

> [n]o element, not itself separately patented, that constitutes one of the
> elements of a combination patent is entitled to patent monopoly, however
> essential it may be to the patented combination and no matter how costly
> or difficult replacement may be.

*Id.* at 345.

8.  In *Sage Products, Inc. v. Devon Indus., Inc.*, 45 F.3d 1575 (Fed. Cir. 1995),

the Federal Circuit was asked to address the question of whether the patentee's

competitor could be held liable for contributory infringement of a patented system for

disposing of sharp metal instruments, when the competitor's customers (hospitals)

replaced the unpatented disposable inner containers used in the system with containers

supplied by the competitor.  The Federal Circuit, citing to its prior opinions in *Everpure,*

*Inc. v. Cuno, Inc.* 875 F.2d 300, 303 (Fed. Cir. 1989), and *Porter v. Farmers Supply*

*Serv., Inc.*, 790 F.2d 882, 885-86 (Fed. Cir. 1986), found that the doctrine of permissible

repair applied to the facts at issue:

> Under similar circumstances, *Everpure* and *Porter* held that users
> replacing exhausted elements did not directly infringe the patented
> combination . . . .  We think the same result is compelled here.  Sage
> wants to hold Devon liable for contributory and induced infringement for
> supplying a replaceable, unpatented element which Sage itself sells and
> recommends replacing.  It thus seeks to keep for itself a market in parts
> which are intended to be periodically replaced - this is no more than an
> attempt to expand patent rights to an unpatented product.  "It is at least
> difficult to accept the notion that one who purchases a disposable
> [element of a product] under instructions to replace it [periodically] is guilty
> of infringement when the buyer does precisely that."  *Everpure*, 875 F.2d
> at 303 . . . .

*Sage*, 45 F.3d at 1579.

6

**A-8**

9.  Having determined that plaintiffs' patent rights are exhausted,[5] the circumstances at bar are analogous to those examined in *Sage*.  There is no doubt that plaintiffs sell the patented combination intending that their customers remove and discard spent canisters.  Like the removable inner containers of the *Sage* disposal system, the canisters are unpatented elements of the '633 combination.  The doctrine of repair "encompasses any repair that is necessary for the 'maintenance of the "use of the whole" of the patented combination through replacement of a spent, unpatented element.'"  *Id.* at 1578 (citing *Aro*, 365 U.S. at 346).  The court concludes that the replacement of the canister is permissible repair.[6]

10.  **Conclusion.**  The court recognizes that the parties rely on different paradigms for their analyses, plaintiffs identifying *Quanta* and *Canon* as more analogous to the facts of record, and defendant identifying *Aro* and *Sage* as the better reasoned in the context of the facts of record.  Consistent with the decision denying plaintiffs' request for injunctive relief (D.I. 89), the court concludes that the facts of record are more appropriately analyzed with reference to the doctrine of permissible

---

[5] Plaintiffs argue that their patent rights are not exhausted; therefore, the doctrine of permissible repair cannot apply.  The court notes in this regard that neither the Supreme Court in *Aro* nor the Federal Circuit in *Sage* analyzed the facts at issue under the doctrine of patent exhaustion.  In other words, it is not at all clear to the court that the issue of patent exhaustion must be specifically addressed before reaching the doctrine of permissible repair.

[6] Plaintiffs' reliance on *Canon, Inc. v. GCC Int'l, Ltd.*, 263 Fed. Appx. 57 (Fed. Cir. 2008), to argue that the canister "dominates the monetization and valuation of the patented technology," does not change the court's analysis.  Reviewing a grant of a preliminary injunction, the Federal Circuit in *Canon* called into question the district court's claim construction and did "not . . . reach[] its final conclusion as to the matter." *Id.* at 61.  The Court noted that "the concept of proportionality [of the value of the replaceable part] is pertinent, though less so in the case of readily replaceable parts." *Id.*

7

**A-9**

repair.  Therefore, for the aforementioned reasons, defendant's motion for summary

judgment of non-infringement is granted.  An appropriate order shall issue.

United States District Judge



US007487776B2

(12) **United States Patent**          (10) **Patent No.:**     **US 7,487,776 B2**

Kleinschmidt                           (45) **Date of Patent:**        **Feb. 10, 2009**

(54) **DEVICE WITH AN ANESTHESIA RESPIRATION SYSTEM AND AN ABSORBER**

(75) Inventor: **Lothar Kleinschmidt**, Krummesse (DE)

(73) Assignee: **Dräger Medical AG & Co. KGaA**, Lübeck (DE)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 817 days.

(21) Appl. No.: **11/058,624**

(22) Filed: **Feb. 15, 2005**

(65) **Prior Publication Data**

US 2005/0235994 A1     Oct. 27, 2005

(30) **Foreign Application Priority Data**

Apr. 24, 2004   (DE) ...................... 10 2004 020 133

(51) **Int. Cl.**
*A61M 11/00* (2006.01)

(52) **U.S. Cl.** ................................... **128/205.12**

(58) **Field of Classification Search** ............ 128/205.12, 128/205.24, 207.12, 204.18, 204.26, 205.13
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 3,707,965 | A | * | 1/1973 | Guzay .................. 128/205.28 |
| 3,830,632 | A | * | 8/1974 | Guzay ....................... 422/120 |
| 4,171,962 | A | * | 10/1979 | Kippel et al. .................. 96/416 |
| 4,353,366 | A | * | 10/1982 | Bickford ................ 128/205.12 |
| 4,991,576 | A | * | 2/1991 | Henkin et al. .......... 128/203.28 |
| 5,743,257 | A | * | 4/1998 | Koehler et al. ......... 128/205.24 |

FOREIGN PATENT DOCUMENTS

| | | |
|---|---|---|
| DE | 197 29 739 | 1/1999 |
| EP | 0 122 301 | 10/1984 |

* cited by examiner

*Primary Examiner*—Steven O Douglas
(74) *Attorney, Agent, or Firm*—McGlew & Tuttle, P.C.

(57)     **ABSTRACT**

A quick connection system between an anesthesia respiration system and an absorber has a gas-tight connection between the anesthesia respiration system and the absorber. The absorber (**1**) has a concentrically arranged gas inlet opening (**8**) and a gas outlet opening (**9**) on its front side (**4**) for this purpose, as well as a guide plate (**3**) that can be pushed into an absorber mount at the anesthesia respiration system. Centering notches (**11**, **12**), which engage a centering pin at the absorber mount, are provided at the guide plate (**3**) in the direction of pushing in.

**14 Claims, 6 Drawing Sheets**





Fig.1



Fig.2



Fig.3

Fig.4



Fig.5



35

34

22

Fig.6



Fig.7

US 7,487,776 B2

**1**

# DEVICE WITH AN ANESTHESIA RESPIRATION SYSTEM AND AN ABSORBER

## CROSS REFERENCE TO RELATED APPLICATIONS

This application claims the benefit of priority under 35 U.S.C. § 119 of DE 10 2004 020 133.1 filed Apr. 24, 2004, the entire contents of which are incorporated herein by reference.

## FIELD OF THE INVENTION

The present invention pertains to a device with an anesthesia respiration system and an absorber that can be connected with the anesthesia respiration system via a quick connection system.

## BACKGROUND OF THE INVENTION

A device of this type has become known from EP 122 301 A1. Anesthesia respiration systems must be able to be used for different modes of operation, and the switchover between the mode of operation shall take place in a simple manner and without operating errors. In addition, nonrepairable items, for example, the carbon dioxide absorber, shall be able to be replaced in a simple manner and rapidly without respiration being compromised. The absorber is arranged in the prior-art anesthesia respiration system in the expiration branch and is connected with switchover elements, which inevitably interrupt the flow of gas in the breathing gas circuit when the absorber is removed and establish separate breathing branches. Quick connection elements, which are designed as lockable plug type connections, are provided for inserting and releasing the absorber.

The absorber has such a design that connecting branches acting as a gas inlet opening and a gas outlet opening are arranged on the front side of a cuboid absorber housing. The drawback of the prior-art absorber design is that the connecting branches must be exactly aligned with the corresponding connection holes when the absorber is inserted into the anesthesia respiration system. Since the absorber is located on the underside of the anesthesia respiration system, the connection holes are not in the user's direct field of vision.

An absorber with a cylindrical housing and concentrically arranged gas inlet and gas outlet can be handled better. An absorber of the type mentioned appears, for example, from DE 197 29 739 C2.

The corresponding connection elements must be placed aligned on one another for a gas-tight connection between the absorber and the anesthesia respiration system in case of this design as well, and larger tolerances may become established due to the manufacture in the connection area between the absorber and the anesthesia respiration system. This happens especially if the absorbers are manufactured as disposable articles and larger tolerances must be allowed for quick connection components at the absorber housing for production technical and cost reasons. Leakage will develop if the absorber tilts in relation to the anesthesia respiration system during mounting.

## SUMMARY OF THE INVENTION

The basic object of the present invention is to improve a device of the type mentioned such that the quick connection system between the anesthesia respiration system and the absorber makes possible a gas-tight connection in a simple manner.

**2**

According to the invention, a device is provided with an anesthesia respiration system and an absorber that can be connected with the anesthesia respiration system via a quick connection system. The absorber has a concentrically arranged gas inlet opening and gas outlet opening on the front side of an absorber housing as well as a guide plate which can be pushed into an absorber mount at the anesthesia respiration system. A centering notch is provided on the front side of the guide plate in the direction of pushing in. A centering pin, which engages the centering notch and fixes the guide plate in an end position, is fastened to the absorber mount.

The advantage of the present invention is essentially that the centering notch, which is pushed against the centering pin on the absorber mount, is provided on the front side of the guide plate, which is arranged at the absorber and is pushed into an absorber mount at the anesthesia respiration system. When the guide plate is inserted into the absorber mount, only pre-centering of the absorber is carried out, because a greater clearance between the guide plate and the absorber mount must be allowed because of the path of displacement in order for the guide plate and the absorber mount to be tilted in relation to one another.

The final fixation is achieved by means of the centering pin at the absorber mount, which engages the centering notch on the front side of the guide plate and acts as a stop for the guide plate, so that the guide plate assumes an exactly defined position in relation to the anesthesia respiration system.

Two centering notches arranged offset by 180° are advantageously provided at the guide plate. The absorber can thus be pushed into the absorber mount without observing a preferred position.

It is useful to provide the centering notches with wedge-shaped wall surfaces in order for the guide plate to be able to be centered by the centering pin without an angular offset and in order for the gas channels to be connected between the absorber and the anesthesia respiration system to be located one above the other in an aligned manner.

An alternative embodiment of a centering pin advantageously has an upper part, which can perform a stroke movement, is under spring tension and engages correspondingly designed locking grooves within the centering notches. A locking function is thus achieved by the upper part snapping into the corresponding locking groove in the stop position of the guide plate.

The various features of novelty which characterize the invention are pointed out with particularity in the claims annexed to and forming a part of this disclosure. For a better understanding of the invention, its operating advantages and specific objects attained by its uses, reference is made to the accompanying drawings and descriptive matter in which preferred embodiments of the invention are illustrated.

## BRIEF DESCRIPTION OF THE DRAWINGS

In the drawings:

FIG. **1** is a side view of the absorber;

FIG. **2** is a top view of the absorber housing in direction of view A according to FIG. **1**;

FIG. **3** is an absorber mount;

FIG. **4** is the absorber mount in direction of view B according to FIG. **3**;

FIG. **5** is a longitudinal section of a connection head for the absorber;

FIG. **6** is an alternative embodiment of a centering pin; and

FIG. **7** is an alternative embodiment of an absorber with locking grooves within the centering notches.

US 7,487,776 B2

**3**

### DESCRIPTION OF THE PREFERRED EMBODIMENTS

Referring to the drawings in particular, FIG. **1** shows the side view of an absorber **1**, which has a guide plate **3** on the anterior front side **4** of an absorber housing **2**. A circular groove **5** is located between the front side **4** and the guide plate **3**.

FIG. **2** shows a top view of the absorber housing **2** in direction of view A according to FIG. **1**. An outer sealing crater **6** and an inner sealing crater **7**, which define a gas inlet opening **8** and a gas outlet opening **9**, are located in the middle of the guide plate **3**. The gas channels **8, 9** are arranged concentrically with one another. Along an axis of symmetry **10**, the guide plate **3** has two centering notches **11, 12** arranged offset by 180° in relation to one another. In parallel to the axis of symmetry **10**, the guide plate **3** has flattened lateral surfaces **13, 14**, which reduce the diameter of the guide plate **3**, at right angles to the axis of symmetry **10**, to the value D **1** compared with the circle diameter D. The centering notches **11, 12** have wall surfaces **15, 16** extending in a wedge-shaped pattern.

FIG. **3** shows an absorber mount **17**, which is located at an adapter plate **18** of an anesthesia respiration system, which is not shown in greater detail. A centering pin **21** is fastened on the top side of the absorber mount **17**, aligned with an axis of symmetry **101**. The absorber mount **17** has side parts **19, 20** bent over in a U-shaped pattern. FIG. **4** shows the absorber mount **17** with the adapter plate **18** in direction of view B according to FIG. **3**. A locking bolt **22** and two bearing blocks **23, 24** connected with the adapter plate **18** are located on the opposite side of the absorber mount **17**. The width D **1** of the absorber mount **17** in the area of the side parts **19, 20** corresponds to the diameter D **1** of the guide plate **3** in the area of the lateral surfaces **13, 14**.

To insert the absorber **1** into the absorber mount **17**, the guide plate **3** is pushed into the side parts **19, 20** along the lateral surfaces **13, 14** until one of the centering notches **11, 12** comes into contact with the centering pin **21**. For reasons of handling, the clearance between the absorber mount **17** and the lateral surfaces **13, 14** of the guide plate **3** is selected to be such that a certain rotary movement is possible between the absorber **1** and the absorber mount **17** to prevent the guide plate **3** from tilting within the absorber mount **17**. The wall surfaces **15, 16** of the centering notches **11, 12** are bent at an angle such that the centering pin **21** is in contact with the wall surfaces **15, 16** in the end position of the absorber **1**, and the axis of symmetry **10** of the absorber **1** and the axis of symmetry **101** of the absorber mount **17** are thus caused to coincide.

FIG. **5** illustrates a longitudinal section of a connection head **25** for the absorber **1**.

The adapter plate **18** is connected with the connection head **25** pivotably around a pin joint **26** via bearing blocks **24, 38**. The bearing block **23**, FIG. **4**, likewise has a pin joint, that is not recognizable in the sectional view in FIG. **5**. A longitudinally displaceable unlocking plate **31** fixes the locking bolt **22** at the connection head **25**. The gas connection is established between the absorber **1** and the connection head **25** via profile packings **27, 28**, an inner profile packing **27** being in contact with the inner sealing crater **7** and an outer profile packing **28** with the outer sealing crater **6**.

With the absorber **1** inserted, the profile packing **27** is pressed inwardly, as a result of which flow valves **29, 30** are opened and a gas connection is established between the absorber **1** and an anesthesia respiration system, not shown

**4**

specifically in FIG. **5**. The connection head **25** is connected with the anesthesia respiration system via a bayonet catch **32**.

To insert the absorber **1**, the stop bolt **22** is unlocked by displacing the unlocking plate **31** and the adapter plate is pivoted around the pin joint **26** along arrow **33**. The absorber **1** is pushed into the absorber mount **17** in the direction of arrow C until one of the centering notches **11, 12** comes into contact with the centering pin **21**. The adapter plate **18** is then pivoted back until the unlocking plate **3** will again lock the stop bolt **22**.

FIG. **6** shows an alternative centering pin **34**, which has an upper part **35** fixed in a spring-movable manner. The upper part **35** is dimensioned such that it engages locking grooves **36, 37** in the area of the centering notches **11, 12**, as can be determined from FIG. **7**. The absorber **1** has entry bevels **111** and **112** to introduce the upper part **35** into the locking grooves **36** and **37**.

While specific embodiments of the invention have been shown and described in detail to illustrate the application of the principles of the invention, it will be understood that the invention may be embodied otherwise without departing from such principles.

What is claimed is:

**1**. An anesthesia respiration system to absorber connection device, comprising:

an absorber for connecting with the anesthesia respiration system, the absorber having an absorber housing, with a gas inlet opening arranged concentrically relative to a gas outlet opening on a front side of said absorber housing, as well as a guide plate;

an anesthesia respiration system absorber mount, said guide plate being adapted to be pushed into said absorber mount;

a centering notch provided on a front side of said guide plate in a direction of pushing in; and

a centering pin, which engages the centering notch and fixes the guide plate in an end position, said centering pin being fastened to said absorber mount.

**2**. A device in accordance with claim **1**, wherein the guide plate has another centering notch arranged offset from said centering notch by 180°.

**3**. A device in accordance with claim **1**, wherein the guide plate has lateral surfaces with flattened portions along the direction of pushing in.

**4**. A device in accordance with claim **2**, wherein the centering notches have wall surfaces, which have a wedge-shaped design and receive the centering pin.

**5**. A device in accordance with claim **2**, wherein said centering pin has an upper part, which can perform a stroke movement and is under spring tension.

**6**. A device in accordance with claim **5**, wherein locking grooves, at least partially receiving said upper part, are present at the centering notches.

**7**. A device in accordance with claim **6**, wherein entry bevels for the upper part are arranged upstream of the locking grooves.

**8**. An anesthesia respiration system to absorber quick connection system, comprising:

an absorber having an absorber housing, with a gas inlet opening concentrically arranged relative to a gas outlet opening on said absorber housing, and a guide portion;

an anesthesia respiration system absorber mount, said guide portion being adapted to be pushed into said absorber mount;

a centering notch provided on a front side of said guide portion with respect to a direction of pushing said guide portion into said absorber mount; and

US 7,487,776 B2

**5**

a centering pin, which engages the centering notch and fixes the guide plate in an end position, said centering pin being fastened to said absorber mount.

**9**. A connection system in accordance with claim **8**, wherein the guide plate has another centering notch arranged offset from said centering notch by 180°.

**10**. A connection system in accordance with claim **8**, wherein the guide plate has lateral surfaces with flattened portions along the direction of pushing in.

**11**. A connection system in accordance with claim **9**, wherein the centering notches have wall surfaces, which have a wedge-shaped design and receive the centering pin.

**6**

**12**. A connection system in accordance with claim **9**, wherein said centering pin has an upper part, which can perform a stroke movement and is under spring tension.

**13**. A connection system in accordance with claim **12**, wherein locking grooves, at least partially receiving said upper part, are present at the centering notches.

**14**. A connection system in accordance with claim **13**, wherein entry bevels for the upper part are arranged upstream of the locking grooves.

\*   \*   \*   \*   \*



US008286633B2

(12) **United States Patent**

Türker et al.

(10) **Patent No.:**    **US 8,286,633 B2**

(45) **Date of Patent:**    **Oct. 16, 2012**

(54) **CARBON DIOXIDE ABSORBER FOR A REBREATHING SYSTEM**

(75) Inventors: **Ahmet Türker**, Lübeck (DE); **Grigory Kholtchanski**, Lübeck (DE); **Sven Pasdzior**, Lübeck-Travemünde (DE); **Robert Lischinski**, Neubrandenburg (DE); **Dirk-Stefan Reichert**, Lübeck (DE)

(73) Assignee: **Dräger Medical GmbH**, Lübeck (DE)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 1174 days.

(21) Appl. No.: **12/129,911**

(22) Filed: **May 30, 2008**

(65) **Prior Publication Data**

US 2008/0295844 A1    Dec. 4, 2008

(30) **Foreign Application Priority Data**

Jun. 2, 2007    (DE) ........................ 10 2007 025 809

(51) **Int. Cl.**
*A63B 31/00*    (2006.01)

(52) **U.S. Cl.** .......... 128/205.28; 128/205.12; 128/205.13

(58) **Field of Classification Search** ............. 128/205.12, 128/205.13, 205.14, 205.24, 205.28, 204.18, 128/204.2, 204.22, 204.26, 202.27, 203.12, 128/203.28, 207.12; 55/504; 96/147
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

| | | | | |
|---|---|---|---|---|
| 3,830,632 A | * | 8/1974 | Guzay | 422/120 |
| 4,266,539 A | * | 5/1981 | Parker et al. | 128/204.26 |
| 4,353,366 A | * | 10/1982 | Bickford | 128/205.12 |
| 4,841,953 A | * | 6/1989 | Dodrill | 128/202.27 |
| 4,991,576 A | * | 2/1991 | Henkin et al. | 128/203.28 |
| 5,002,050 A | * | 3/1991 | McGinnis | 128/204.18 |
| 5,452,713 A | * | 9/1995 | Vipond et al. | 128/204.18 |
| 5,744,030 A | * | 4/1998 | Reid et al. | 210/235 |
| 5,765,550 A | * | 6/1998 | Psaros et al. | 128/202.27 |
| 6,440,201 B1 | * | 8/2002 | Billiet | 96/147 |
| 6,461,397 B1 | * | 10/2002 | Billiet | 55/498 |
| 6,491,034 B1 | * | 12/2002 | Gunaratnam et al. | ... 128/204.18 |
| 6,581,598 B1 | * | 6/2003 | Foran et al. | 128/204.23 |
| 7,174,893 B2 | * | 2/2007 | Walker et al. | 128/206.21 |
| 7,344,582 B2 | * | 3/2008 | Pearson et al. | 55/504 |
| 7,442,220 B2 | * | 10/2008 | Pearson et al. | 55/418 |
| 7,487,776 B2 | * | 2/2009 | Kleinschmidt | 128/205.12 |
| 7,802,568 B2 | * | 9/2010 | Eicher et al. | 128/200.14 |
| 7,850,765 B2 | * | 12/2010 | Kleinschmidt | 96/147 |
| 7,964,024 B2 | * | 6/2011 | Chen et al. | 95/139 |
| 2005/0235994 A1 | * | 10/2005 | Kleinschmidt | 128/205.12 |
| 2007/0215159 A1 | * | 9/2007 | Ross et al. | 128/205.28 |
| 2009/0107505 A1 | * | 4/2009 | Kleinschmidt | 128/205.28 |
| 2009/0188505 A1 | * | 7/2009 | Smart et al. | 128/205.24 |
| 2011/0168180 A1 | * | 7/2011 | Lugtigheid | 128/205.14 |

FOREIGN PATENT DOCUMENTS

DE    102004020133 B3    8/2005

* cited by examiner

*Primary Examiner* — Glenn Richman

(74) *Attorney, Agent, or Firm* — McGlew and Tuttle, P.C.

(57)    **ABSTRACT**

A carbon dioxide absorber for a rebreathing system can be connected to a connection head of the rebreathing system in a simple manner. A centering device (**43**, **44**, **45**, **46**), provided in the area of a guide plate (**40**) of the absorber (**4**), can be caused to mesh with centering pins pointing in the direction of the absorber from the connection head.

**13 Claims, 10 Drawing Sheets**





Fig. 1



Fig. 2



Fig. 3



Fig. 4



Fig. 5



Fig. 6



Fig. 7



Fig. 8



Fig. 9



Fig. 10



Fig. 11

Fig. 12

US 8,286,633 B2

**1**

# CARBON DIOXIDE ABSORBER FOR A REBREATHING SYSTEM

## CROSS REFERENCE TO RELATED APPLICATIONS

This application claims the benefit of priority under 35 U.S.C. § 119 of German Patent Application DE 10 2007 025 809.9 filed Jun. 2, 2007, the entire contents of which are incorporated herein by reference.

## FIELD OF THE INVENTION

The present invention pertains to a carbon dioxide absorber for a rebreathing system.

## BACKGROUND OF THE INVENTION

A carbon dioxide absorber in the form of an absorber cartridge for a rebreathing system is known from DE 10 2004 020 133 B3. The carbon dioxide absorber is fastened to a connection head of the rebreathing system by means of a pivotable mount. The connection head is used to connect the absorber to the rebreathing system or to also replace a used absorber with a new one even during operation. Valves are provided for this within the connection head; on the one hand, these valves bridge over the gas ducts to the absorber in the form of a bypass when the absorber has been removed, so that no gas can escape from the rebreathing system. On the one hand, a gas connection is established to the absorber when the absorber is connected to the connection head. The absorber has, on its top side, a guide plate, which is pushed into the pivotable mount on the connection head. To center the absorber in relation to the connection head, a centering notch is provided at the guide plate and a centering pin on the mount. The absorber is connected to the connection head when the centering pin is in contact with the wedge-shaped centering notch. However, there always is a certain clearance between the pivotable mount and the connection head because of manufacturing tolerances, so that a mismatch may develop between the gas ducts of the connection head and of the absorber. Since the absorber is normally fastened to the underside of the rebreathing system, the centering notch and the centering pin are normally not visible to the user. Thus, the user cannot readily recognize whether the centering pin is located within the centering notch when the absorber is inserted into the mount in a tilted position.

## SUMMARY OF THE INVENTION

The basic object of the present invention is to improve a carbon dioxide absorber such that it can be connected to the connection head of a rebreathing system in a simple manner.

According to the invention, a carbon dioxide absorber is provided for a rebreathing system. The carbon dioxide absorber comprises a connection head at the rebreathing system with the connection head including a pivotable mount. The absorber has an absorber housing with a guide plate on a front side of the absorber housing, the guide plate being able to be pushed into the pivotable mount of the connection head. Guide plate gas ducts are arranged concentrically at the guide plate. Connection head gas ducts are provided in the connection head and with a design corresponding to the guide plate gas ducts. The guide plate gas ducts are for connection to the connection head gas ducts. Guide grooves are provided between the guide plate and the absorber housing for connecting the guide plate to the mount. Centering pins point in

**2**

the direction of the absorber housing from the connection head. A centering means is in one or more of the guide plate and the absorber housing. The centering means is for meshing with the centering pins from the connection head.

The centering means may comprise upper positioning grooves arranged opposite each other with corresponding centering pins in the area of the guide grooves. The centering means may further comprise lower positioning grooves at the absorber housing, the lower positioning grooves extending flush with the upper positioning grooves and for meshing with free ends of the centering pins. The centering pins may taper towards a free end thereof in a wedge-shaped pattern. An outer contour of the centering pins may correspond to an inner contour of the upper positioning grooves. An outer contour of the centering pins may correspond to an inner contour of the lower positioning grooves.

The advantage of the present invention is essentially that the absorber is centered in relation to the connection head by upper positioning grooves at the guide plate in combination with centering pins, which engage the upper positioning grooves from the connection head. Increased tightness of the gas ducts is achieved in the connection area between the absorber and the connection head due to the improved centering of the absorber in relation to the connection head.

In the absorber known from DE 10 2004 020 133 B3 (which corresponds to U.S. patent application Ser. No. 11/058,624 filed Feb. 15, 2005), the absorber is centered in relation to the pivotable mount only. A centering notch is provided for this purpose in the guide plate of the absorber, and a centering pin, which is located within the centering notch in the inserted state of the absorber, is located at the bracket. Provisions are made according to the present invention for the centering pins to be arranged directly at the connection head such that these mesh with lateral upper positioning grooves at the guide plate of the absorber when the mount is pivoted in the direction of the connection head. The absorber is thus directly centered in relation to the connection head. The upper positioning grooves are preferably arranged in the area of the lateral guide grooves of the absorber. However, other areas of the guide plate or of the absorber housing are also suitable for centering if they can be caused to mesh with the centering pin of the connection head when the mount is pivoted.

The centering pins are advantageously arranged opposite each other in the area of the guide grooves.

It is especially advantageous to additionally provide in the absorber housing lower positioning grooves, which extend flush with the upper positioning grooves and act as a stop for the centering pins. Centering is further improved by the lower positioning grooves, because the centering pins can be caused to mesh both with the upper and lower positioning grooves.

It is advantageous to make the centering pins wedge-shaped in such a way that they taper towards the free end, and to design, in addition, the upper positioning grooves and the lower positioning grooves corresponding thereto. The centering pins are thus in contact with the upper positioning grooves and the lower positioning grooves in a positive-locking manner in the coupled state of the absorber.

An exemplary embodiment of the present invention is shown in the figure and will be explained in more detail below. The various features of novelty which characterize the invention are pointed out with particularity in the claims annexed to and forming a part of this disclosure. For a better understanding of the invention, its operating advantages and specific objects attained by its uses, reference is made to the accompanying drawings and descriptive matter in which the preferred embodiment of the invention is illustrated.

US 8,286,633 B2

<table>
<tr><td>3</td><td>4</td></tr>
</table>

## BRIEF DESCRIPTION OF THE DRAWINGS

In the drawings:

FIG. 1 is a sectional view showing a connection head with an absorber;

FIG. 2 is a schematic sectional perspective view showing a connection area between the connection head and the absorber according to FIG. 1;

FIG. 3 is a sectional view showing an absorber connected to the connection head;

FIG. 4 is sectional perspective view showing the connection area in a longitudinal section between the connection head and the absorber according to FIG. 3;

FIG. 5 is a perspective view of the underside of the connection head with the locking element inserted;

FIG. 6 is a perspective view of the locking element according to FIG. 5;

FIG. 7 is a perspective view showing the absorber according to FIG. 1;

FIG. 8 is a perspective view showing the absorber according to FIG. 7 in the area of the guide plate;

FIG. 9 is a side broken away view showing the absorber before insertion into the mount;

FIG. 10 is a side broken away view showing the mount with the absorber inserted;

FIG. 11 is a perspective broken away view showing the mount with the absorber in a sectional view; and

FIG. 12 is a side broken away view showing the mount according to FIG. 11 with the mount snapped into the connection head.

## DESCRIPTION OF THE PREFERRED EMBODIMENT

Referring to the drawings in particular, FIG. 1 schematically shows a longitudinal section of a connection head 1 with a valve means 2 and with an absorber 4 accommodated in a pivotable mount 3.

FIG. 2 schematically illustrates the connection area between the connection head 1 and the absorber 4.

The connection head 1 has a housing 5 with a connection piece 6 for connection to an anesthetic breathing system, not shown more specifically in FIG. 2; a guide sleeve 7, which accommodates the valve means 2, and an annular locking element 8 within the housing 5 with a release button 9.

The mount 3, which receives the absorber 4, has a barb 10, which snaps into a wall section 11 of the locking element 8. To connect the absorber 4 to the connection head 1, the absorber 4 is pushed into the mount 3 and pivoted in the direction of the connection head 1. Reference is made in this connection to the disclosure of DE 10 2004 020 133 B3, which is part of this specification (and is incorporated by reference and corresponding U.S. patent application Ser. No. 11/058,624 filed Feb. 15, 2005, is also hereby incorporated by reference.

The absorber 4 has an inner gas duct 12 with an inner valve crater 13 and an outer gas duct 14 arranged concentrically thereto with an outer valve crater 15. The gas ducts 12, 14 describe the flow paths through the absorber 4.

The inner gas duct 12 passes within the connection head 1 through the interior space of the valve means 2, and the outer gas duct 14 in an annular space between the valve means 2 and the guide sleeve 7. A sealing ring 16, which has an outer sealing lip 17 directed towards the absorber 4, and an inner sealing lip 18, which is in contact with an outer ring section 19 of the valve means 2, is located on the underside of the guide sleeve 7. The ring section 19 is located between a first cylindrical wall section 20 of the valve means 2 with the larger cross section and a second cylindrical wall section 21 with a smaller diameter, which latter wall section adjoins same. The wall sections 20, 21 and the ring section 19 together form a valve housing 201 of the valve means 2. The inner sealing lip 18 and the ring section 19 form a second sealing area 24 and are designed to interrupt the gas flow in the annular space as a shut-off means when the absorber 4 has been removed from the connection head 1.

The second wall section 21 is provided with an elastomer ring 22 at its free end, which extends in the direction of the absorber 4. When the absorber 4 is pivoted in the direction of the connection head 1, the outer sealing lip 17 lies on the outer valve crater (seat) 15 and forms a first sealing area 23. The elastomer ring 22 is located on the inner valve crater 13 in this position of the absorber 4.

A flow valve 31 with a valve body 25, which is in contact with a sealing lip 26, is located on the top side of the first wall section 20 of the valve means 2. The valve body 25 is pressed by a compression spring 27 against the sealing lip 26. The valve body 25 is in contact with a projection 29 of the housing 5 via spacers 28. Due to the fixation by means of the spacers 28, the valve body 25 always has a fixed position in relation to the housing 5. The flow valve 31 opens when the valve housing 201 is displaced in the direction of the spacers 28. In the position of the absorber 4 shown in FIG. 2, the path of gas 30 extends via the inner gas duct 12 through the free spaces between the spaces 28 to the outer gas duct 14.

FIG. 3 shows the connection head 1 with the connected absorber 4.

FIG. 4 shows the connection area between the connection head 1 and the absorber 4 corresponding to FIG. 3 in a longitudinal section. Identical components are designated by the same reference numbers as in FIGS. 1 and 2. The barb 10 has snapped into the wall section 11 of the spring element 8 in the coupled state. The outer valve crater 15 is in contact with the outer sealing lip 17. The inner valve crater 13 is located at the elastomer ring 22 and presses the valve housing 201 of the valve means 2 upward against the force of the compression spring 27. Since the valve body 25 is supported at the projection 29 via the spacers 28 and thus remains in its original position, the sealing lip 26 lifts off from the valve body 25 and the flow valve 31 is opened. At the same time, the ring section 19 separates from the inner sealing lip 18 and the second sealing area 24 is opened. The path of gas 30 from the anesthetic breathing system now leads via the opened flow valve 31 in the inner gas duct 12 and to the absorber 4. The backflow takes place via the outer gas duct 14, the opened second sealing area 24 and the annular gap between the valve means 2 and the guide sleeve 7 back to the anesthetic breathing system.

The outer sealing lip 17 is designed in this embodiment as a lip seal with a large deformation area in order to reduce the sealing forces that must be overcome when the mount 3 is coupled with the connection head 1 and to compensate differences in height in the form of manufacturing tolerances.

With the absorbed 4 uncoupled, the sealing ring 16 is pulled off from the guide sleeve 7 downward for cleaning purposes and the valve means 2 can be removed and taken apart for cleaning purposes. No tool is necessary for disassembly. The components of the connection head 1 may be manufactured from plastic according to the injection molding process and can be manufactured at a very low cost as a result.

FIG. 5 shows a bottom view of the connection head 1 with the valve means 2 removed and with the bracket 3 removed in view "A" according to FIG. 2. The mount 3 is fastened pivotably in the bushes 32 of the housing 5. The locking element

US 8,286,633 B2

**5**

8 has spacing elements **33**, which are in contact with a leaf spring **36**, the leaf spring **36** being supported at projections **34** of the housing **5**.

FIG. **6** shows the locking element **8** in a perspective view. The locking element **8** comprises a rigid frame **35**, to which the likewise rigid spacing elements **33** are fastened. When pressure is applied to the release button **9**, the frame **35** deforms and the wall section **11** is displaced in the direction of arrow **37** against the spring force of the leaf spring **36**, FIG. **5**. The stroke of the locking element **8** is limited by a contact surface **38**, which is in contact with the housing **5**, FIG. **5**, at maximum deflection. When pressure is applied to the release button **9**, the barb **10**, FIG. **2**, is released.

FIG. **7** illustrates the absorber **4** in a perspective view. A guide plate **40** is fastened to the top side of an absorber housing **39**, and guide grooves **41**, **42** arranged opposite each other are provided between the guide plate **40** and the absorber housing **30**. The guide plate **40** has upper positioning grooves **43**, **44** arranged opposite each other in the area of the guide grooves **41**, **42** and lower positioning grooves **45**, **46** extending flush with the upper positioning grooves **43**, **44**.

FIG. **8** shows the absorber **4** in the area of the guide plate **40** in a perspective view. Identical components are designated by the same reference numbers as in FIG. **7**.

FIG. **9** shows the absorber **4** before insertion into the mount **3** of the connection head **1**. The connection head **1** has centering pins **47**, **48**, which are arranged opposite each other and of which only the front centering pin **47** is shown in FIG. **9**. The centering pins **47**, **48** are designed as pins tapering in a wedge-shaped manner towards the free end. To connect the absorber **4** to the mount **3**, the absorber is pushed into the underside **50** of the mount **3** along arrow **49**. The underside **50** is beveled for this inwardly, so that the guide plate **40** is held by the underside **50**. The guide grooves **41**, **42** extend in the area of the centering pins **47**, **48**.

FIG. **10** shows the mount **3** with the absorber **4** pushed in.

FIG. **11** shows the mount **3** with the absorber **4** inserted, the mount being cut open along the section lines **51**, **52**. The centering pin **47** is located in the area of the upper positioning groove **44** of the guide plate **40**. Identical components are designated by the same reference numbers as in FIGS. **8** and **9**. The mount **3** is fastened such that it can be pivoted about a pin joint fastened to the connection head **1**.

FIG. **12** shows the mount **3** connected to the connection head **1**. The front centering pin **47** is located completely within the upper positioning groove **44** and lies with its tip within the lower positioning groove **46**. The rear centering pin **48**, not shown in FIG. **12**, is located within the rear upper positioning groove **43** and lies with its tip within the lower positioning groove **45**. The free ends of the centering pins **47**, **48** taper in a wedge-shaped manner, and the inner walls of the upper positioning grooves **43**, **44** and of the lower positioning grooves **45**, **46** are designed corresponding thereto, so that the absorber **4** has only a very small clearance in relation to the connection head **1**.

While a specific embodiment of the invention has been shown and described in detail to illustrate the application of the principles of the invention, it will be understood that the invention may be embodied otherwise without departing from such principles.

What is claimed is:

**1**. A carbon dioxide absorber for a rebreathing system, the carbon dioxide absorber comprising:

a connection head at the rebreathing system, said connection head including a pivotable mount;

an absorber housing;

**6**

a guide plate on a front side of said absorber housing, said guide plate being pushed into said pivotable mount of said connection head;

guide plate gas ducts arranged concentrically at said guide plate;

connection head gas ducts provided in said connection head and with a design corresponding to said guide plate gas ducts, said guide plate gas ducts for connection to said connection head gas ducts;

guide grooves between said guide plate and said absorber housing for connecting said guide plate to said mount;

centering pins pointing in a direction of said absorber housing from said connection head; and

centering means in one or more of said guide plate and said absorber housing, said centering means for meshing with said centering pins from said connection head;

said pivotable mount being pivotable between a first position and a second position, said first position arranging said pivotable mount adjacent said connection head, said second position arranging said pivotable mount spaced from said connection head and said centering pins.

**2**. A carbon dioxide absorber in accordance with claim **1**, wherein said centering means comprises upper positioning grooves arranged opposite each other with corresponding said centering pins in an area of said guide grooves.

**3**. A carbon dioxide absorber in accordance with claim **2**, wherein said centering means further comprises lower positioning grooves at said absorber housing, said lower positioning grooves extending flush with said upper positioning grooves and for meshing with free ends of said centering pins.

**4**. A carbon dioxide absorber in accordance with claim **1**, wherein said centering pins taper towards a free end thereof in a wedge-shaped pattern.

**5**. A carbon dioxide absorber in accordance with claim **4**, wherein:

said centering means comprises upper positioning grooves arranged opposite each other with corresponding said centering pins in an area of said guide grooves; and

an outer contour of said centering pins corresponds to an inner contour of said upper positioning grooves.

**6**. A carbon dioxide absorber in accordance with claim **4**, wherein:

said centering means comprises lower positioning grooves at said absorber housing, said lower positioning grooves for meshing with free ends of said centering pins; and

an outer contour of said centering pins corresponds to an inner contour of said lower positioning grooves.

**7**. A carbon dioxide absorber in accordance with claim **1**, wherein:

said pivotable mount defines an opening;

said centering means defines positioning grooves as part of said centering means, said centering pins passing through said opening of said pivotable mount, and into said positioning grooves of said centering means when said pivotable mount moves from said first position into said second position.

**8**. A rebreathing system with carbon dioxide absorber comprising:

a rebreathing system connection head including a pivotable mount, said connection head having connection head gas ducts provided in said connection head, said connection head having centering pins pointing outwardly from said connection head;

an absorber housing with a guide plate on a front side of said absorber housing, said guide plate for being pushed into said pivotable mount of said connection head, said guide plate including guide plate gas ducts arranged

US 8,286,633 B2

7

8

concentrically at said guide plate with a design corresponding to said connection head gas ducts, said connection head gas ducts for connection to said guide plate gas ducts, guide grooves being provided between said guide plate and said absorber housing for connecting said guide plate to said mount; and

centering means in one or more of said guide plate and said absorber housing, said centering means for meshing with said centering pins from said connection head, said centering means defining upper positioning grooves arranged opposite each other with corresponding said centering pins in an area of said guide grooves, said centering means further defining lower positioning grooves at said absorber housing, said lower positioning grooves extending flush with said upper positioning grooves and for meshing with free ends of said centering pins.

**9**. A rebreathing system with carbon dioxide absorber in accordance with claim **8**, wherein said centering pins taper towards a free end thereof in a wedge-shaped pattern.

**10**. A rebreathing system with carbon dioxide absorber in accordance with claim **9**, wherein:

an outer contour of said centering pins corresponds to an inner contour of said upper positioning grooves.

**11**. A rebreathing system with carbon dioxide absorber in accordance with claim **9**, wherein:

an outer contour of said centering pins corresponds to an inner contour of said lower positioning grooves.

**12**. A carbon dioxide absorber arrangement in a rebreathing system, the absorber arrangement comprising:

an absorber housing for holding a carbon dioxide absorber material, said absorber housing defining ducts for bringing breathing gas in contact with the carbon dioxide absorber material;

a guide plate mounted on one side of said absorber housing, one of said guide plate and said absorber housing defining a positioning groove;

a pivotable mount adapted to connect to said guide plate, said pivotable mount and said guide plate being shaped to have said guide plate slide into said pivotable mount in a direction along said one side of said absorber housing;

a connection head adapted to connect to the rebreathing system and defining connection head ducts in communication with the rebreathing system, said pivotable mount being pivotally connected to said connection head to bring said ducts of said absorber housing into communication with said ducts of said connection head;

a centering pin extending from said connection head in a direction of said absorber housing, said centering pin cooperating with said positioning groove to align said ducts of said absorber housing with said ducts of said connection head;

said pivotable mount being pivotable between a first position and a second position, said first position arranging said ducts of said absorber housing in communication with said ducts of said connection head, said second position arranging said pivotable mount spaced from said connection head and said centering pin.

**13**. An absorber arrangement in accordance with claim **12**, wherein:

said pivotable mount defines an opening, said centering pin passing through said opening, and into said positioning groove when said pivotable mount moves from said first position into said second position.

\* \* \* \* \*

# CERTIFICATE OF COMPLIANCE
## WITH TYPE-VOLUME LIMITATION, TYPEFACE REQUIREMENTS, AND TYPE STYLE REQUIREMENTS

The undersigned hereby certifies that this brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B). The brief contains 10,273 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

The undersigned also hereby certifies that this brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6). The brief has been prepared in a proportionally spaced typeface using Microsoft Office Word 2010 in 14-point Book Antiqua type style, with 14-point or larger Book Antiqua type style headings.

As permitted by Federal Rule of Appellate Procedure 32(a)(7)(C)(i), the undersigned has relied upon the word count of this word processing system in preparing this certificate.

Dated: June 29, 2015        By: */s/ Cyrus A. Morton*

Cyrus A. Morton
Counsel for Plaintiffs-Appellants

# PROOF OF SERVICE

I hereby certify that on July 15, 2015, the foregoing APPELLANTS

DRÄGER MEDICAL GMBH ET AL.'S CORRECTED

NONCONFIDENTIAL OPENING BRIEF and ADDENDUM was filed with

the Clerk of the Court for the United States Court of Appeals for the

Federal Circuit using the appellate CM/ECF system which pursuant to

Federal Rule of Appellate Procedure 25(c)(2) and Federal Circuit ECF-6(A)

constitutes service on all parties represented by attorneys who have

registered for the CM/ECF system, and that a copy was served on counsel

of record for Defendant-Appellee via FedEx and e-mail:

> Keith J. Grady
> Robyn Ast-Gmoser
> John Michael Challis
> Karen Zelle Morris
> POLSINELLI PC
> 100 S. Fourth Street, Suite 1000
> St. Louis, MO 63102
> kgrady@polsinelli.com
> rastgmoser@polsinelli.com
> jchallis@polsinelli.com
> kzmorris@polsinelli.com

Dated: July 15, 2015          By: /s/ *Cyrus A. Morton*
                                   Cyrus A. Morton
                                   Counsel for Plaintiffs-Appellants